[No. B088344. Second Dist., Div. Seven. Dec. 13, 1995.]

ADAM KIDRON et al., Plaintiffs and Appellants, v.
MOVIE ACQUISITION CORPORATION et al., Defendants and
Respondents.

COUNSEL

Hillel Chodos, Gina M. Putkoski Chodos and Michael A. Chodos for Plaintiffs and Appellants.

Kinsella, Boesch, Fujikawa & Towle and Cathleen Collins for Defendants and Respondents.

OPINION

**WOODS (Fred), J.—**

## I

### INTRODUCTION

This case arises out of a dispute between partners in a joint venture to produce a failed television series entitled *Catwalk*. Kidron,[1] the originator of the concept, complained that his former partners Franklin/Waterman,[2] the producers of the series, stole his rights to *Catwalk* and ousted him from production of the series. Kidron filed his complaint naming 23 defendants.

Respondents Movie Acquisition Corp. and Initial Groupe (collectively, MAC)[3] were two of the defendants named in Kidron's complaint. In July 1992, MAC agreed with Franklin/Waterman to distribute *Catwalk* in certain international territories. MAC maintained in the trial court and on this appeal

---

[1] "Kidron" refers to plaintiffs and appellants Adam Kidron and his wholly owned companies, Marvellous Pictures, Ltd., and Marvelous Pictures.

[2] "Franklin/Waterman" refers collectively to defendants Jeffrey Franklin, Stephen Waterman and their affiliated companies.

[3] Movie Acquisition and Initial Groupe were, at the time of the events at issue in this appeal, subsidiaries of Luminere, a motion picture distributor based in London and France. Movie

that Kidron included MAC as a defendant for the sole reason that the distribution agreement existed, since MAC never performed the distribution agreement with Franklin/Waterman chiefly because of chain of title problems.

The trial court found that Kidron's evidentiary showing was insubstantial as to MAC's involvement in the Franklin/Waterman scheme and granted MAC's motion for nonsuit at the conclusion of Kidron's case-in-chief followed by a dismissal. This appeal followed.

II

FACTS AND PROCEEDINGS IN THE TRIAL COUNT

A.  *MAC Entered Into the Distribution Agreement With No Knowledge of Kidron's Dispute With Franklin/Waterman.*

1.  *MAC's first notice of the existence of the proposed series.*

MAC first became aware of *Catwalk* in or about February 1992, in a meeting between Kidron and Christopher Cary, who was then a consultant for MAC. Kidron attended the meeting to "pitch" the series to Cary and to solicit Cary's assistance in inducing MAC to distribute *Catwalk* in certain international territories. At this initial meeting, Kidron explained that he had entered into a joint venture with Franklin/Waterman to produce *Catwalk* from an idea that Kidron claimed to be his own. Beyond these facts, Kidron did not explain the terms of his agreement with Franklin/Waterman, other than possibly to mention that Stallion International was the entity with whom MAC was likely to deal, if MAC agreed to distribute *Catwalk.*

Cary then recommended to MAC's officers that they meet with Franklin, Waterman and Kidron during a planned visit to Los Angeles in February 1992. At the meetings in Los Angeles, Kidron, Franklin and Waterman represented to MAC's representatives that they were all working together to produce *Catwalk.* They did not discuss the terms of the contractual relationship between Kidron and Franklin/Waterman and neither Kidron nor Franklin/Waterman ever gave MAC a complete copy of the agreement that set forth their respective rights and obligations. Additionally, there was no discussion about the identity of the entity with whom MAC would be contracting to distribute *Catwalk.* Kidron expressed no reservations about contributing his rights in *Catwalk* to the joint venture and, in fact, had told

Acquisition and Initial Groupe have since been absorbed by Lumiere and no longer operate under these independent names.

Cary that negotiations would have to be conducted with Franklin/Waterman, not with him.

   2.   *MAC's distribution agreement with Franklin/Waterman was signed by MAC without notice of the dispute.*

During the period of March through July 1992, representatives of MAC negotiated the terms of a distribution agreement (the Distribution Agreement) with Franklin/Waterman. At trial, Kidron admitted that he was aware that these negotiations were going on and was doing whatever was necessary to close the deal with MAC.

In its final form, which was signed on July 9, 1992, the Distribution Agreement provided, in pertinent part, that:

   1.   MAC would advance $3.6 million for the rights to distribute *Catwalk* in England, France and certain other foreign territories, with payment made as follows:

   (a)   10 percent ($360,000) upon execution of the Distribution Agreement, provided that MAC had received (1) written confirmation that *Catwalk* had been fully financed, (2) a copy of the completion bond, and (3) a copy of the errors and omissions insurance policy; and

   (b)   90 percent ($3,240,000) upon delivery to, and acceptance by, MAC of *Catwalk*.

   2.   MAC would provide an irrevocable letter of credit to secure payment of $3,240,000, to be made payable on the delivery to and the acceptance by MAC of the series.

   3.   MAC had approval rights with respect to the chain of title, the completion guarantor and the terms and conditions of the completion bond.

   4.   Franklin/Waterman warranted that it had the power and authority to enter into and perform the Distribution Agreement and to sell and assign the rights to *Catwalk*.

   5.   Franklin/Waterman warranted that there were no claims or litigation pending or threatened that would adversely affect MAC's right to distribute *Catwalk*; and

   6.   MAC and Franklin/Waterman would indemnify each other for, among other things, any damages arising out of breaches of their respective warranties.

At no time prior to the signing of the Distribution Agreement, nor during the two months thereafter, did Kidron or any representative of Franklin/Waterman inform MAC that a dispute existed between them. Indeed, when Kidron flew to London in March of 1992, to deliver a draft of the script to MAC, he perceived his existing problems with Franklin/Waterman to be serious enough to discuss them with his London counsel. Kidron elected not to reveal these problems to MAC, however. Even when the dispute had escalated to the point that Kidron was no longer working on *Catwalk* and he and Franklin/Waterman had engaged counsel to trade accusations of breach of contract, MAC was kept in the dark. Additionally, Franklin/Waterman, who purported to be representing the interest of the joint venture with Kidron, warranted in the Distribution Agreement that there were no threatened claims or litigation that would adversely affect MAC's right to distribute *Catwalk*. The motive for nondisclosure of the dispute by Kidron and Franklin/Waterman is readily discernible from the record. Kidron, Franklin and Waterman each acknowledged at trial that MAC's agreement to distribute *Catwalk* was essential to the deal and was the final Distribution Agreement needed to make the project viable.

B. *MAC's Performance of Its Obligations Under the Distribution Agreement.*

1. *Payment of the deposit.*

Uninformed of Kidron's departure from the series and of the threats of legal action, MAC's counsel initiated a series of communications with Franklin/Waterman in August 1992, regarding each party's performance under the Distribution Agreement. As MAC's obligation to pay the 10 percent deposit was contingent on receipt of the three items—proof of financing, a copy of the completion bond and a copy of the errors and omissions policy—MAC asked that Franklin/Waterman satisfy these conditions before payment was made. MAC also requested documentary evidence of the chain of title, which MAC always required in its distribution deals. After several exchanges of correspondence, Franklin/Waterman was able to provide MAC with the three required items, i.e., the proof of financing, a satisfactory errors and omissions policy and a completion guarantee. Accordingly, MAC paid the 10 percent deposit on October 1, 1992, pursuant to its contractual obligations.

2. *Chain of title problems.*

Franklin/Waterman was never able to provide MAC with satisfactory proof of chain of title, despite numerous attempts and some contentious

exchanges. While proof of chain of title was not a prerequisite for payment of the initial deposit, Franklin/Waterman was obliged to provide adequate documentation of title no later than delivery of *Catwalk*, to receive the balance of the moneys due. In an increasingly heated exchange of communications, Franklin/Waterman proffered numerous documents purporting to demonstrate chain of title, which MAC repeatedly rejected. On September 9, 1992, Stephen Waterman wrote to Alasdair Waddell, chief executive of MAC, expressing his frustration with MAC's counsel, Sonali Wijeyaratne, for refusal to accept chain of title. Waddell responded with a telephone call to Waterman, who disclosed for the first time that Kidron and Franklin/Waterman were in the midst of a disagreement, but that it did not relate to chain of title and they were trying to settle it.

Waddell was not satisfied, however, and MAC continued to press for additional chain of title documentation. Following a telephone conversation between Buddy Epstein, Franklin/Waterman's counsel, and Wijeyaratne, MAC drafted a letter dated September 22, 1992, in which MAC again set forth its requirements that chain of title be clear before *Catwalk* was delivered. Instead of sending this letter, Waddell telephoned Waterman to discuss the points raised in the letter. As reflected in Waddell's notes of his conversation, Waddell informed Waterman that while MAC was willing to pay the $360,000 deposit after receiving the errors and omissions policy and the completion guarantee, MAC would make no further payments until Franklin/Waterman had resolved its dispute with Kidron regarding chain of title.

MAC's insistence on this point never wavered. Epstein acknowledged MAC's continuing demand for title in a letter dated October 23, 1992. Moreover, Franklin/Waterman's continuing failure to resolve this issue was reflected in correspondence from MAC as late as March 11, 1993, in which the need for documentation for chain of title was repeated.

3. *The letter of credit.*

Because MAC expected Franklin/Waterman to resolve its differences with Kidron and because of MAC's obligations under the Distribution Agreement, MAC continued its negotiations with Franklin/Waterman regarding the establishment of a letter of credit. The letter of credit did not provide a cash payment to Franklin/Waterman; rather, it served as security for MAC's payment of the balance due under the contract. Notably, the letter of credit expressly provided that it was payable only upon confirmation from MAC that it had accepted delivery of *Catwalk* in accordance with the terms and conditions of the Distribution Agreement. Accordingly, the letter of credit

was of no value to Franklin/Waterman until it had provided evidence to MAC that the chain of title was intact. Moreover, provision of the letter of credit was in no way material to the production of *Catwalk,* which Columbia Pictures Television had agreed to finance in full in August 1992, and which was well into production by the time the letter of credit was issued in January 1993. After numerous communications between the parties, which included a threat by Franklin/Waterman to sue MAC, Franklin/Waterman accepted the terms of the letter of credit offered by MAC.

### C.  *MAC's Limited Knowledge of the Dispute Between Kidron and Franklin/Waterman.*

Kidron admitted that he had contacted no one at MAC when he left the series in May 1992, following his disagreement with Franklin/Waterman. Indeed, Kidron's next contact with MAC was not until mid-September 1992, when he spoke to Christopher Cary and, without giving any details, explained that he was no longer working on *Catwalk* and that he was planning litigation against Franklin/Waterman. This was MAC's first notice of Kidron's departure from the series and caused Cary great concern. When Cary asked whether he should make any efforts to reinstate Kidron on the series, however, Kidron refused his offer of assistance. Additionally, Kidron never suggested or urged that in response to Kidron's alleged exclusion by Franklin/Waterman, MAC should abandon its involvement in *Catwalk.* Moreover, while Kidron told Cary of his intention to sue Franklin/Waterman, he said nothing about suing MAC or holding MAC responsible for his situation.

Information from Franklin/Waterman regarding the dispute was no more enlightening. In response to MAC's queries about the nature of the dispute, Franklin/Waterman assured MAC that it was being resolved and that it did not relate to chain of title. MAC, reinforced by assurances it received from Franklin/Waterman, believed the dispute would be settled.

MAC's first notice of the substance of Kidron's claims against Franklin/Waterman (and MAC) came on or about October 28, 1992, when MAC learned that Kidron had sued numerous entities, including MAC, regarding alleged fraudulent acts related to his rights in *Catwalk.* As provided in the Distribution Agreement, Franklin/Waterman undertook MAC's defense in this action. MAC continued its preparations to distribute *Catwalk* and continued to perform its obligations under the Distribution Agreement, in the belief that the matter would be settled by the time of delivery.

### D.  *MAC's Rejection of Delivery of Catwalk.*

When Franklin/Waterman finally delivered the first episodes of *Catwalk* in March 1993, it was evident that Franklin/Waterman had failed to abide by

several terms of the Distribution Agreement and, on those bases MAC rejected delivery. MAC's decision to reject *Catwalk* and, consequently, to not pay the $3,240,000 owed on the advance, was based on several factors, including Franklin/Waterman's critical failure to deliver chain of title. Because the precondition of MAC's acceptance of delivery had not been satisfied, the letter of credit expired. MAC then transferred to Columbia the few contracts that it had signed with broadcasters and severed all connections to *Catwalk.* In September 1993, Franklin/Waterman, through a related entity, sued MAC for breach of the Distribution Agreement. MAC asserted a cross-claim in that action, alleging fraud and breach of contract and seeking, among other things, return of the $360,000 initial deposit. This second action was settled after the conclusion of the trial at issue in this appeal. MAC found itself in the position of being sued simultaneously for performing—and not performing—its obligations under the Distribution Agreement.

## III

### STANDARD OF REVIEW

■ "The granting of a motion for nonsuit is warranted when, disregarding conflicting evidence, giving plaintiff's evidence all the value to which it is legally entitled, and indulging in every legitimate inference that may be drawn from the evidence, the trial court determines that there is no evidence of sufficient substantiality to support a verdict in favor of plaintiff." (*Bolin* v. *San Bernardino City Unified School Dist.* (1984) 155 Cal.App.3d 759, 767 [202 Cal.Rptr. 416]; see also *O'Keefe* v. *South End Rowing Club* (1966) 64 Cal.2d 729 [51 Cal.Rptr. 534, 414 P.2d 830, 16 A.L.R.3d 1] [to overturn a judgment of nonsuit, a Court of Appeal must find in the record substantial evidence to support a verdict for plaintiff under a tenable theory of liability.].)

Plaintiff cannot prevail unless he can demonstrate *substantial* evidence in the record to support each claim asserted. Mere conjecture or nonsensical interpretations of evidence are not sufficient to overturn a nonsuit. In *Jones* v. *Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 402 [209 Cal.Rptr. 456], the court stated: "The rules governing the granting of a nonsuit . . . do not relieve the plaintiff of the burden of establishing the elements of his case. The plaintiff must therefore produce evidence which supports a logical inference in his favor and which does more than merely permit speculation or conjecture. [Citations.] If a plaintiff produces no substantial evidence of liability or proximate cause then the granting of a nonsuit is proper." And, while the court may infer facts from the evidence, those inferences must be logical and reasonable. The decision about what

inferences can permissibly be drawn by the fact finder are questions of law for determination by the court, inasmuch as an inference may not be illogically and unreasonably drawn, nor can an inference be based on mere possibility or flow from suspicion, imagination, speculation, supposition, surmise, conjecture or guesswork. (*California Shoppers, Inc.* v. *Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 44-45 [221 Cal.Rptr. 171]; *People* v. *Austin* (1994) 23 Cal.App.4th 1596, 1604 [28 Cal.Rptr.2d 885]; see also *Slater* v. *Keller* (1964) 224 Cal.App.2d 126, 128 [36 Cal.Rptr. 430] [". . . it is incumbent upon the plaintiff to produce evidence which supports a logical inference in his favor and which does more than raise a mere conjecture or surmise that the fact is as alleged."].)

Finally, the appellate court's review must be based on the whole record, not just the excerpts chosen by the appellant. "[I]n all cases, the determination whether there was substantial evidence to support a finding or judgment must be based on the whole record. The reviewing court may not consider only supporting evidence in isolation, disregarding all contradictory evidence." (*Rivard* v. *Board of Pension Commissioners* (1985) 164 Cal.App.3d 405, 412 [210 Cal.Rptr. 509].)

IV

DISCUSSION

A. *The Fundamental Principles of Civil Conspiracy Law.*

■ To prove a claim for civil conspiracy, Kidron was required to provide substantial evidence of three elements: (1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) damages arising from the wrongful conduct. ■ As is well established, civil conspiracy is not an independent tort. (*Applied Equipment Corp.* v. *Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 510-511 [28 Cal.Rptr.2d 475, 869 P.2d 454].) Rather, civil conspiracy is a "legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. [Citation.]" (*Id.,* at pp. 510-511.) As Witkin explains, "If [the plaintiff] can show that each [of several defendants] committed a wrongful act or some part of it, e.g., that each made false representations, he has no need of averments of conspiracy. But if A alone made representations, the plaintiff can hold B and C liable with A only by alleging and proving that A acted pursuant to an agreement (conspiracy) with B and C to defraud." (5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 869, p. 311.)

Accordingly, "[t]he basis of a civil conspiracy is the formation of a group of two or more persons who have agreed to a common plan or design to commit a tortious act." (1 Levy et al., Cal. Torts (1995) Civil Conspiracy, § 9.03[2], p. 9-12; see *Youst* v. *Longo* (1987) 43 Cal.3d 64, 79 [233 Cal.Rptr. 294, 729 P.2d 728, 85 A.L.R.4th 1025] ["the conspirators must agree to do some act which is classified as a 'civil wrong'"].) ■ The conspiring defendants must also have actual knowledge that a tort is planned and concur in the tortious scheme with knowledge of its unlawful purpose. (*Wyatt* v. *Union Mortgage Co.* (1979) 24 Cal.3d 773, 784-786 [157 Cal.Rptr. 392, 598 P.2d 45] ["a plaintiff is entitled to damages from those defendants who concurred in the tortious scheme with knowledge of its unlawful purpose"]; *People* v. *Austin, supra,* 23 Cal.App.4th 1596, 1607 ["without knowledge of the illegal purpose there is no basis for inferring an agreement"].)

However, actual knowledge of the planned tort, without more, is insufficient to serve as the basis for a conspiracy claim. Knowledge of the planned tort must be combined with intent to aid in its commission. "The sine qua non of a conspiratorial agreement is the knowledge on the part of the alleged conspirators of its unlawful objective and their intent to aid in achieving that objective." (*Schick* v. *Lerner* (1987) 193 Cal.App.3d 1321, 1328 [238 Cal.Rptr. 902]; see also *Michael R.* v. *Jeffrey B.* (1984) 158 Cal.App.3d 1059, 1069 [205 Cal.Rptr. 312] ["[m]ere knowledge, acquiescence, or approval of an act, without cooperation or agreement to cooperate is insufficient to establish liability"].) "This rule derives from the principle that a person is generally under no duty to take affirmative action to aid or protect others." (1 Levy et al., Cal. Torts, *supra,* Civil Conspiracy, § 9.03[2], p. 9-13.)

While knowledge and intent "may be inferred from the nature of the acts done, the relation of the parties, the interest of the alleged conspirators, and other circumstances" (*Wyatt* v. *Union Mortgage Co., supra,* 24 Cal.3d at p. 785), " '[c]onspiracies cannot be established by suspicions. There must be some evidence. Mere association does not make a conspiracy. There must be evidence of some participation or interest in the commission of the offense.' " (*Davis* v. *Superior Court* (1959) 175 Cal.App.2d 8, 23 [345 P.2d 513].) An inference must flow logically from other facts established in the action. (See *People* v. *Austin, supra,* 23 Cal.App.4th at p. 1604.)

■ In sum, Kidron was required to offer substantial and credible evidence at trial of all three elements: that MAC knew about Franklin/Waterman's alleged scheme to defraud Kidron of his rights to *Catwalk,* that he intentionally joined Franklin/Waterman in this scheme and that such intentional joinder was done for the purpose of injuring Kidron. Kidron failed to

make this showing at trial, and the court correctly granted MAC's motion for a nonsuit.

B.  *There Is No Evidence, Circumstantial or Otherwise, to Establish Any Liability of MAC as a Coconspirator.*

In substance, Kidron's complaint against Franklin/Waterman alleges that Franklin/Waterman stole the rights to *Catwalk* by fraudulently inducing Kidron, as the originator of the underlying concept, to contribute his rights to a joint venture with Franklin/Waterman, then ousting Kidron from *Catwalk* in May 1992. Kidron concedes in his opening brief that MAC cannot be deemed a conspirator in the scheme unless there is substantial evidence that MAC both *knew* about Franklin/Waterman's allegedly fraudulent activities and *intentionally agreed* to aid in the wrongdoing. (See, e.g., appellant's opening brief ["It was . . . necessary for plaintiffs to present evidence from which the jury could conclude that MAC, with the knowledge of the existence of the tortious scheme and its unlawful purpose, entered into an agreement with the Franklin/Waterman defendants to participate in the tortious scheme to exploit plaintiff's *Catwalk* concept in violation of plaintiff's rights."].) In the appellant's opening brief, Kidron further states: "MAC's liability is based [upon] the agreement to assist in the tortious scheme of Franklin and Waterman with knowledge of its wrongful purpose."

Having acknowledged his burden, however, Kidron has failed to cite to any substantial evidence that MAC *knew* of Franklin/Waterman's alleged scheme to defraud Kidron or that MAC *intentionally agreed* to join Franklin/Waterman in its perpetration. The purportedly fraudulent acts—inducing Kidron to join the venture and, later, ousting him—occurred without MAC's knowledge, long before MAC had even signed a deal with Franklin/Waterman. Kidron, therefore, had no evidence whatsoever that MAC joined in the alleged fraud at the time it occurred. To fill this void, Kidron resorted to an *ex post facto* theory of conspiracy, to conjure up inferences of wrongdoing from MAC's legitimate performance under the Distribution Agreement.

To establish "knowledge" of the alleged fraud, Kidron cited (1) MAC's problems in securing full documentation of chain of title from Franklin/Waterman; (2) Kidron's September 1992 communication with MAC, that he was no longer working on *Catwalk* and was going to sue Franklin/Waterman; and (3) MAC's receipt of Kidron's complaint. Kidron's "evidence" of the second element—MAC's alleged "intentional agreement" to join Franklin/Waterman in the fraud—we find to be lacking in substantiality, i.e., MAC's partial performance of its obligations under the Distribution Agreement, including payment of the $360,000 deposit and the establishment of the

letter of credit. We note that Kidron strains and fails in this court's mind to reconcile MAC's ultimate decision to refuse to distribute *Catwalk* or pay Franklin/Waterman the balance owed, $3.24 million, with his conspiracy theory.

1. *There is no evidence that MAC had actual knowledge of a plan to defraud Kidron.*

As the legal principles set forth, *ante*, make clear, to hold a defendant liable for joining an ongoing conspiracy to commit a tort, there must be evidence that the joiner had *actual knowledge* of the scheme to commit the tort. For example, in *Holder v. Home Sav. & Loan Assn.* (1968) 267 Cal.App.2d 91, 108 [72 Cal.Rptr. 704], the Court of Appeal affirmed a nonsuit on a conspiracy-to-defraud claim because one element "essential to the existence of a conspiracy" is "knowledge on the part of the alleged conspirators of the conspiracy and its unlawful purpose," and "[t]he record here does not show that any officer of Home knew of an intent to misrepresent willfully . . . ." As the record in the instant case makes abundantly clear, at no time—either before or after the signing of the Distribution Agreement—did MAC know of Franklin/Waterman's alleged scheme to defraud Kidron.

a. *MAC had no knowledge of a plan to defraud Kidron before it signed the Distribution Agreement.*

Neither Kidron nor any other party introduced evidence at trial that *before* MAC entered into the Distribution Agreement, MAC had any knowledge that Franklin/Waterman and Kidron were even quarreling or that Kidron disputed Franklin/Waterman's right to produce *Catwalk*. The record clearly reflects, through the testimony of Waddell and Buddy Epstein, questions regarding a defect in the chain of title did not arise until *after* the Distribution Agreement was signed and the testimony of Kidron himself *admitted* that he did not tell MAC about the dispute until September, long after MAC had signed the Distribution Agreement. Indeed, a reasonable inference to be drawn from the uncontroverted evidence in this record is that both Kidron and Franklin/Waterman deliberately concealed their dispute in the spring of 1992, to induce MAC to enter into the Distribution Agreement. We note that none of the terms of the Distribution Agreement reflects any knowledge by MAC of the dispute with Kidron or a concern with the chain of title. Additionally, Franklin/Waterman warranted in the Distribution Agreement that there was no threatened claim or litigation with regard to *Catwalk*. It is illogical to assume that MAC would allow such a standard provision to be included in the Distribution Agreement if MAC knew that Kidron was threatening litigation.

b. *MAC had no knowledge of a plan to defraud Kidron after it signed the Distribution Agreement.*

Similarly, there is no evidence to support Kidron's assertion that MAC had actual knowledge of a plan to defraud Kidron *after* it had signed the Distribution Agreement. As a threshold matter, MAC had no reason to believe that Franklin/Waterman's initial difficulties in providing chain of title meant that Franklin/Waterman had stolen the concept for *Catwalk* from Kidron. Indeed, from the inception of his relationship with MAC, Kidron had instructed MAC to deal directly with Franklin/Waterman; further, MAC understood that the rights to *Catwalk* would be emanating from the joint entity, not from Kidron himself.

Additionally, MAC had no substantial knowledge of the terms that governed the joint venture between the parties. In his testimony regarding his negotiations with MAC, Kidron stated merely that he had told Christopher Cary that he was in a joint venture with Franklin/Waterman and that the contracting party would be a company called Stallion. Kidron himself confirmed the limited information supplied to MAC in a letter to Jeff Franklin, in which he stated: "At this meeting [with Cary] I explained that Beta had made an offer for Germany, Italy, and Spain but that it might be possible for Italy and Spain to become available should an offer be made quickly by Initial. Chris asked what the structure of our deal was and therefore who the contracting party would be. I explained that our deal was crystallized in Stallion, Inc., which, under agreement, is the vehicle intended to hold all rights pertaining to 'Catwalk.' *That is the total extent of my conversation and the information that I imparted.*" (Italics added.)

Kidron affirmed the truth of this letter at trial. When cross-examined by MAC on this point, Kidron admitted that, in fact, he had "no specific recollection" of imparting any additional information to MAC, including information about joint control. This version is supported by the testimony of Christopher Cary.

Absent knowledge of the terms of the agreement between Kidron and Franklin/Waterman, MAC, as a mere distributor of *Catwalk*, was in no position to police that agreement. Indeed, Kidron himself did not expect MAC to assume that role. When Kidron spoke to Cary and explained his version of the dispute in September 1992, Kidron made no mention whatsoever that he believed that MAC should refuse to distribute *Catwalk*, only that he had been excluded from its production. As Cary testified, "the way in which Adam represented [his dispute with Franklin/Waterman] was that I felt it was some kind of internal production dispute. . . ." Indeed, when Cary offered to help Kidron, Kidron refused.

Furthermore, MAC's receipt of Kidron's complaint in late October 1992 cannot be construed as evidence of MAC's knowledge of Franklin/Waterman's alleged scheme. Rather, service of the complaint provided MAC with its first notice of Kidron's *claim* that Franklin/Waterman had stolen the concept for *Catwalk*. Kidron equates knowledge of the *claim* of fraud with *actual* knowledge of fraud. Kidron, however, cites no authority for the proposition that, in the context of conspiracy, knowledge sufficient to arouse suspicion that an allegation *may be* true, is equivalent to positive knowledge that the allegation *is* true. To the contrary is *Lewis* v. *Superior Court* (1994) 30 Cal.App.4th 1850, 1859 [37 Cal.Rptr.2d 63]. " 'Fraudulent intent,' 'collusion,' 'active participation,' 'fraudulent scheme'—this is the language of *deliberate wrongful conduct*. It belies any notion that one can become a fraudulent transferee by accident, or even negligently. It certainly belies the notion that guilty knowledge can be created by the fiction of constructive notice." (Original italics.)

Moreover, there is no evidence that MAC had any means to investigate or verify Kidron's fraud and constructive fraud claims once MAC learned of the nature of the dispute. Franklin/Waterman warranted that it owned the rights to *Catwalk*; Kidron disputed Franklin/Waterman's ownership. The record supports an inference that MAC correctly recognized that it was not in a position to take sides or to act as judge in a dispute between third parties who were thousands of miles away. Indeed, resolution of this dispute absorbed months of discovery and six weeks of trial and, three years later, it is not yet settled. In the absence of a reliable means to learn the truth, MAC did the only legally and financially sensible thing: it gave Franklin/Waterman notice that it had to clear the chain of title before delivery.

This record is clear that MAC's demands concerning chain of title and MAC's scant understanding of the substance and equities of the dispute between Kidron and Franklin/Waterman are insufficient, as a matter of law, to infer that MAC knew of Franklin/Waterman's tortious plan to defraud Kidron. Because Kidron has failed to provide this court with substantial evidence of an essential element of his conspiracy claim, it must fail. "[W]ithout knowledge of the illegal purpose there is no basis for inferring an agreement." (*People* v. *Austin, supra*, 23 Cal.App.4th at p. 1607.)

C. *There Is No Evidence That MAC Intended to Agree to Defraud, and Intended to Defraud, Kidron.*

Even *if* MAC had knowledge of Franklin/Waterman's scheme to defraud Kidron, Kidron has failed to offer any evidence that MAC intentionally joined Franklin/Waterman in its alleged perfidy. To hold a defendant liable

for joining an ongoing conspiracy to commit a tort, there must be evidence that the late joiner *intended to agree to commit* and *intended to commit* the tort. (See *People* v. *Marks* (1988) 45 Cal.3d 1335, 1345 [248 Cal.Rptr. 874, 756 P.2d 260] ["Conspiracy requires a dual specific intent: '(a) the intent to agree, or conspire, and (b) the intent to commit the offense, which is the object of the conspiracy' "].) In other words, there must be evidence that MAC, at the eleventh hour, intended to agree to defraud Kidron and intended to defraud Kidron. Accordingly, it was necessary for Kidron to show both that MAC intended to join with Franklin/Waterman to defraud Kidron and that MAC had a purpose of its own to defraud Kidron, not to simply act as an unwitting assistant to Franklin/Waterman's purported fraud.

1. *MAC's dealings with Franklin/Waterman are devoid of any intent to agree and any agreement to defraud Kidron.*

There is simply no evidence in the record that MAC agreed with Franklin/Waterman to do anything but distribute *Catwalk,* as Kidron hoped it would. The chief roadblock to MAC's distribution efforts, however, was Franklin/Waterman itself.

As the correspondence between MAC and Franklin/Waterman clearly demonstrates, MAC's inquiries about problems with the chain of title arose after Franklin/Waterman was unable to respond satisfactorily to routine requests for documentation of the chain in August and September 1992. Subsequently, MAC learned from Stephen Waterman and Kidron that a dispute had been ongoing for some months, and that Kidron was no longer working on the series. Far from taking Franklin/Waterman's side in that dispute, MAC continued its dogged pursuit of documentation of the chain of title and warned Franklin/Waterman that if the dispute with Kidron was not resolved by the time *Catwalk* was delivered, and the proof of chain of title established, MAC would be under no obligation to perform pursuant to the Distribution Agreement. As Waddell testified, Franklin/Waterman became angrily impatient with MAC for refusing to accept the proof offered, hardly convincing evidence of a tortfeasor trying to lure a third party into a conspiracy. Moreover, MAC's repeated *written* insistence of proof of the chain of title to *Catwalk* cannot reasonably be construed as evidence of a party who is conspiring to steal rights to the series. Had MAC been willing to collude with Franklin/Waterman, it would have dispensed with proof of chain of title, or, simply have accepted the chain of title, as offered.

Kidron urges on this court that the record reflects a conversation between himself and Cary regarding an alleged "big" meeting, to take place in Los Angeles in September 1992, among "all the partners" (apparently including

MAC, Claster, Beta/Taurus and Sony/Columbia) to discuss Kidron's dispute with Franklin/Waterman and how to proceed in light of that dispute. Kidron also represents that the record reflects that after the "big" meeting, "all the partners" decided to go forward, without regard to Kidron's rights.

The record does not support this contention. Rather, Kidron's actual testimony is merely that Christopher Cary allegedly told him that Cary and Waddell were going to meet with Franklin and Waterman in Los Angeles, and encouraged Kidron to send a copy of his complaint to another distributor, Beta/Taurus, to put additional pressure on Franklin/Waterman to reinstate him on *Catwalk*. On cross-examination, Kidron admitted that he had no evidence that a meeting with "all the partners" had ever taken place, nor did he offer any evidence at trial to support this allegation. The only witnesses competent to give testimony about this alleged "big" meeting of "all the partners"—Cary and Waddell—testified that they had no knowledge of any such meeting. The only "meeting" in the record took place when Cary and Waddell were in Los Angeles in September of 1992 to meet with Warner Bros. and had breakfast with Jeffrey Franklin to discuss merchandising issues and the status of the filming of *Catwalk*.

The evidence demonstrates that MAC's interest lay not with joining Franklin/Waterman to allegedly defraud Kidron, but rather with a resolution of the Kidron/Franklin/Waterman dispute, so that *Catwalk* could be completed and distributed. While Cary expressed concern and sympathy for Kidron, the evidence clearly demonstrates that MAC refrained from taking sides in the dispute. As Jean Cazes testified, "I'm not saying that we don't care about the fact if Adam Kidron is right or not that's not at all what I'm saying. What I'm saying is that the matter has to be resolved by the time of delivery, and by the time of delivery, the rights have to be there. That's what I'm saying." Waddell testified that MAC did not believe that it could renege on the Distribution Agreement simply because of Kidron's complaint. MAC had concluded that to cease its performance before the delivery date, MAC would have needed proof that the defect in chain of title was irremediable, which would not be determined until trial.

2. *No inference may be drawn from MAC's continued performance of its contractual obligations.*

Without any actual evidence of an agreement by MAC to assist in a tortious scheme, Kidron seeks to draw an inference of such an agreement from the fact that MAC, supposedly with knowledge that Franklin/Waterman was defrauding Kidron, agreed to carry out its contractual obligations under the Distribution Agreement, including the furnishing of financing to Franklin/Waterman. The law does not permit any such inference to be drawn.

a. *The facts presented at trial demonstrate that MAC had no intent to defraud Kidron.*

At trial, Franklin/Waterman attempted unsuccessfully to argue that MAC's payment of the initial 10 percent deposit constituted acceptance of the chain of title. This argument was quickly impeached, however, when Franklin/Waterman's counsel was forced to acknowledge that correspondence drafted by him weeks *after* payment of the deposit clearly demonstrated that MAC was still disputing chain of title. Rather, as the testimony of MAC's executives and the supporting documentation demonstrate, MAC's payment of the initial deposit merely signified MAC's acceptance of the proffered proof of financing, completion guarantee and errors and omissions policy. MAC expected its concerns regarding the chain of title to be allayed, at the latest, at the time of delivery of the series.

Kidron focuses on MAC's establishment of the letter of credit, seeking to characterize it as essential to the financing and completion of *Catwalk* and, therefore, evidence of MAC's intent to defraud. As the terms of the letter of credit make clear, no payment would be made thereunder *unless and until* MAC informed the issuing bank that it had accepted delivery of the series, in conformity with the terms of the Distribution Agreement. In short, the letter of credit incorporated MAC's demand for proof of chain of title and was not an unconditional source of funding. By establishing the letter of credit under these terms, MAC clearly reserved its right to withhold 90 percent of its funding until it was satisfied that the chain of title was intact.

Moreover, Kidron's characterization of the letter of credit as crucial to Franklin/Waterman's scheme is strained. As acknowledged at trial by Gregory Boone, in-house counsel for Columbia Television Pictures, Columbia agreed to finance the entire series in a written agreement dated August 21, 1992. Thus, the cash to finance the series flowed from Columbia, *not* from MAC. Franklin/Waterman was looking to MAC's final payment, which the letter of credit secured, to repay Columbia, not to fund the series. Moreover, as MAC's final payment was not due until *delivery* of *Catwalk*, Kidron cannot persuasively argue that the production of the series depended on MAC's payment. Indeed, the series was fully produced without MAC's payment, which was never made.

Finally, Franklin/Waterman's pledge of MAC's anticipated payments as security for Columbia's agreement to finance *Catwalk* cannot create an inference that MAC had agreed to defraud Kidron, particularly because Franklin/Waterman entered into the deal with Columbia in August 1992, long after MAC had agreed to provide the letter of credit and before MAC

was aware of the dispute between Franklin/Waterman and Kidron. Under these circumstances, no negative inference of intent can be drawn with regard to MAC's provision of the letter of credit.

> b. *The law does not permit any inference to be drawn from MAC's performance of its contractual obligations.*

An entity that engages in legitimate business with a party that is acting tortiously cannot be deemed a coconspirator, absent clear evidence of an agreement to join in the tortious conduct. For example, in *Harris* v. *Capitol Records etc. Corp.* (1966) 64 Cal.2d 454 [50 Cal.Rptr. 539, 413 P.2d 139], the defendants, Capitol Records Distributing Corporation, Columbia Records Distribution Corporation, and RCA Victor Distributing Corporation, sold records to retail record stores at 38 percent off list price, and sold records to rack-jobbers[4] at 44.2 percent off list.

The plaintiff sued the defendant distributors because a rack-jobber opened a retail store across the street from the plaintiff's record store and proceeded to advertise and sell Capitol, Columbia, and RCA records at 50 percent off list price. (64 Cal.2d at p. 457.) The plaintiff alleged the defendant distributors were guilty of collusion or conspiracy with the rack-jobbers in selling records at less than cost in violation of the Unfair Practices Act. (*Id.,* at p. 462.) The Supreme Court disagreed: "Plaintiff contends, in effect, that defendants 'had reason to know' from various conversations with [the rack-jobber] that the latter intended to sell at retail the records he would buy from them at a rack-jobber's discount, and they took no action to prevent him from doing so. But the fact that defendants 'had reason to know' that [the rack-jobber] was selling at retail as well as at wholesale is insufficient as a matter of law to establish that defendants were guilty of collusion or conspiracy with the [rack-jobber] in this activity. To be a conspirator one must share a common purpose with another, not merely suspect or have knowledge of the other's own private purpose. When, as here, the goods are not contraband or illegal or restricted commodities, a distributor may sell to a jobber-retailer even though he may have 'reason to know' that the latter intends to resell below cost." (*Id.,* at p. 462.) "Responsibility for the difficulties involved here rests primarily on [the rack-jobber], rather than on any of the three distributing companies which provided him records on the same terms as they sold to all similar subdistributors." (*Id.* at pp. 463-464.)

Similarly, in the instant case, MAC was entitled to perform its obligations under the Distribution Agreement—including the establishment of the letter

---

[4]A rack-jobber is a subdistributor who places records in self-service racks in supermarkets, drugstores, and similar retail outlets in which the sale of records is only an incidental item. Distributors gave rack-jobbers a greater discount because of their extra expenses in supplying and servicing the racks. (64 Cal.2d at pp. 456-457.)

of credit—even if MAC suspected that Franklin/Waterman intended to defraud Kidron. Responsibility for Kidron's alleged difficulties rests on Franklin/Waterman, rather than on MAC, who, as far as the record shows, agreed to distribute *Catwalk* on terms that were customary in the industry and to which Kidron did not object.

In *People* v. *Lauria* (1967) 251 Cal.App.2d 471 [59 Cal.Rptr. 628], the owner of a telephone answering service, who knew his service was being used by prostitutes, was indicted for conspiracy to commit prostitution. The Court of Appeal held that intent to participate was not inferable unless the owner of the telephone answering service had a special interest in the prostitutes' activities (*id.,* at p. 480), and there was no evidence of such special interest: "Neither excessive charges for standardized services, nor the furnishing of services without a legitimate use, nor an unusual quantity of business with call girls, are present. The offense which he is charged with furthering is a misdemeanor, a category of crime which has never been made a required subject of positive disclosure to public authority. Under these circumstances, although proof of Lauria's knowledge of the criminal activities of his patrons was sufficient to charge him with that fact, there was insufficient evidence that he intended to further their criminal activities, and hence insufficient proof of his participation in a criminal conspiracy with his codefendants to further prostitution." (*Id.,* at p. 483.)

Similarly, Kidron presented no evidence that MAC had a "special interest" in defrauding Kidron. In fact, MAC had far greater interest in having the Kidron dispute resolved so that *Catwalk* could be delivered. MAC's provision of financing to *Catwalk* was legitimate and was done on terms consistent with those in the industry. MAC's actions, therefore, cannot serve as the basis for a conspiracy claim or even an inference thereof.

In *People* v. *Donahue* (1975) 46 Cal.App.3d 832 [120 Cal.Rptr. 489], the producer of an allegedly obscene film, and the president and the manager of a theater at which the film was shown, were charged with conspiracy to prepare, distribute and exhibit obscene matter. The Court of Appeal affirmed the trial court's dismissal for lack of evidence, finding that the fact the theater defendants possessed the film with the intent to exhibit it was not evidence that the theater defendants had conspired with the producer to produce and exhibit the film. The Court of Appeal noted with approval the following argument at trial: "Defense counsel in arguing against a holding on the conspiracy count stated that an obscene magazine, for example, has to be prepared, printed, stapled and distributed eventually to a bookstore. According to the district attorney's theory every seller of such magazine becomes a party to an evil or corrupt agreement with all the other parties

connected with the preparation and distribution of the offensive material." (*Id.,* at p. 838.) The Court of Appeal added: "We find it contrary to the basic concept of fairness in the administration of justice to haphazardly join as criminal conspirators motion picture producers and exhibitors, authors and booksellers, playwrights and theater manager." (*Id.,* at p. 840.) Kidron's attempt to sweep MAC into a global conspiracy against him is equally invalid and overreaching.

### 3. *MAC had no motive to remove Kidron from Catwalk.*

Finally, there is a complete absence of any evidence of a motive on the part of MAC to want Kidron ousted from the series. There is no evidence that MAC believed that Kidron presented an obstacle of any sort. To the contrary, as MAC's Cary testified, he believed that Kidron had "a clear vision of what the heart of the show was" and was disappointed to learn that he was not working on *Catwalk.*

Moreover, there is no evidence that the financial position of MAC would have improved in any way if Franklin/Waterman failed to split its share of profits with Kidron, or if Franklin/Waterman refused to give credit to, or share creative control with, Kidron. Had MAC proceeded with the deal, MAC's profits would have arisen from the *distribution* of *Catwalk* and were not determined, or affected, by the agreement between Kidron and Franklin/Waterman.

In sum, the record lends no support to the notion that MAC intended to agree to defraud Kidron or intended to defraud Kidron. To the contrary, MAC *refused* to distribute *Catwalk,* absent proof of chain of title, thereby exposing itself to retaliation by Franklin/Waterman, which quickly followed.

### D. *Damages Are Not at Issue in This Appeal.*

Kidron's arguments regarding damages are misplaced and have no relevance to this appeal. The sole issue on appeal is whether Kidron introduced sufficient evidence against MAC at trial to survive a motion for nonsuit. Thus, a discussion of whether MAC would be liable for any damages is unnecessary and inappropriate at this point in the case. Were Kidron successful on appeal, this case would have to be retried in front of a new jury, with MAC afforded an opportunity to present a full defense as to both liability and damages. We see no relevance to an issue of damages on this appeal, find the issue premature and do not reach the issue.

### E. *Kidron's Conspiracy-to-Defraud Claim Fails Because MAC Could Not Conspire After the Fact to Commit a Completed Tort.*

According to Kidron, the alleged conspiracy to defraud was not completed when Franklin/Waterman obtained control of the *Catwalk* concept because

"[c]ontrol of the concept would not have any value or afford any benefit to [Franklin/Waterman] or their confederates, except to the extent that a multi-million-dollar television series based on that concept was developed, produced, distributed and exploited, and the proceeds and benefits retained by them to the exclusion of plaintiffs." The alleged conspiracy to defraud supposedly continued until "the stolen concept" was converted into "a lucrative television show."

Kidron's theory of conspiracy requires the court to accept the premise that one can be liable for the commission of a tort that has already been committed by another. In examining the temporal element in criminal conspiracies, the courts have repeatedly held that one cannot be liable as a coconspirator if the crime was committed before he joined the conspiracy. (See, e.g., *People* v. *Zamora* (1976) 18 Cal.3d 538, 560 [134 Cal.Rptr. 784, 557 P.2d 75] [". . . acts committed by conspirators subsequent to the completion of the crime which is the primary object of a conspiracy cannot be deemed to be overt acts in furtherance of that conspiracy"].) In *People* v. *Marks*, *supra*, 45 Cal.3d 1335, 1345, the court found that "[a] conspirator cannot be held liable for a substantive offense committed pursuant to the conspiracy if the offense was committed *before* he joined the conspiracy." Consequently, the court noted, "We seriously doubt that a post-murder act could be in furtherance of the charged conspiracy because its object, murder, had already been achieved." (*Id.,* at p. 1345.) In the instant case, Franklin/Waterman's alleged purpose—to steal Kidron's concept—was achieved by May 1992, when Kidron left the show. The fact that Franklin/Waterman had not yet realized any profits at that time is not a basis on which to allege a continuing conspiracy.

Cases addressing civil conspiracy also do not support Kidron's apparent rearview mirror image of the course of events. For example, in *General Advertising Agency, Inc.* v. *Komer* (1967) 251 Cal.App.2d 805 [60 Cal.Rptr. 10], the Court of Appeal reversed a judgment based on a claim of conspiracy to commit an already completed tort. In *Komer,* plaintiff General Advertising alleged that defendant Komer wrongfully lured plaintiff's client, Mayfair, to transfer its advertising account from General Advertising to a new agency. Mayfair terminated its account with General Advertising in July of 1962; the Mayfair account was later acquired by defendant Y & K, a corporation organized by Komer on June 1, 1963. The court reversed the conspiracy claim against Y & K: "There cannot possibly be any basis for the trial court's finding that in July 1962 [Y & K] conspired with Komer and others to influence [General Advertising]'s clients to withdraw their accounts.

"Plaintiff argues that Y & K is liable upon the theory that one who knowingly joins a conspiracy after its formation becomes a party to it. The

short answer is that as of June 1, 1963, there wasn't any conspiracy. The only wrongful acts of which there is any evidence were committed in July 1962. Y & K had nothing to do with these." (251 Cal.App.2d at p. 812; see also *Wyatt* v. *Union Mortgage Co.*, *supra*, 24 Cal.3d 773 [conspiracy to commit a tort is completed when the last act induced by the conspiracy has been completed].)

Having named as alleged conspirators entities that had nothing to do with the underlying fraudulent acts, Kidron argues that his expansive theory of conspiracy is appropriate because an intellectual property allegedly has no value until it has been exploited. California cases that examine the theft of intellectual property do not support Kidron's thesis, which confuses the motive for committing an unlawful act and the unlawful act itself. For example, in *Maheu* v. *CBS, Inc.* (1988) 201 Cal.App.3d 662 [247 Cal.Rptr. 304], the Court of Appeal held that a conspiracy to convert confidential letters written by Howard Hughes was completed once the letters were acquired; subsequent publication of a book based on the stolen letters was a distinct act not in furtherance of the conspiracy to convert. The plaintiff in *Maheu* sued not only the person who allegedly stole the letters, but also named as conspirators all those whose efforts were necessary to turn the letters into profit: the author of the book, the publisher, and two bookstore chains. (*Id.*, at pp. 667-668.) The Court of Appeal refused to accept this overblown theory of conspiracy.

Also addressing the exploitation of an intellectual property, *Davis* v. *Superior Court, supra,* 175 Cal.App.2d 8, involved allegations of a conspiracy to remove a book written by an inmate from a state prison without the permission of the warden, against an attorney, a literary agent and a book publisher. The agent and the publisher published the book *after* a demand for its return by the state. (*Id.* at pp. 12-13.) The Court of Appeal set aside the conspiracy indictment, finding: "Following the analogy of the situation involved in the receipt of stolen goods, the act of accepting such goods, even with the knowledge that they are stolen, does not make out an inference of guilt of the stealing. . . . [¶] . . . [¶] Respondent urges that Davis stood to gain from the receipt of the manuscript since he was to share in profits made from its sale and publication. . . . The fact that a recipient of stolen goods may profit from the subsequent sale of the goods does not show the guilt of the theft. Here the receipt of the manuscript, even if Davis were to profit eventually from it, does not show he wrongfully conspired to take it from the prison." (*Id.* at p. 23.) "We cannot fashion a conspiracy for the alleged 'smuggling' from subsequent participation in actions relating to sale and publication. . . . [U]pon that theory the petitioners would be vicariously charged with criminal acts committed *before* they joined the conspiracy." (*Id.* at p. 26, italics in original.)

The Court of Appeal concluded that plaintiff's claim for conspiracy against the publisher and the agent must fail. In the companion case against the publisher of the manuscript, *Longstreth* v. *Superior Court* (1959) 175 Cal.App.2d 27 [345 P.2d 525], the court also declined to find Longstreth, the publisher, liable as a conspirator. The court noted that Longstreth's "only connection with the alleged conspiracy emanate[d] from acts subsequent to the taking of the manuscript and wholly concerned with the sale and publication of the book." (*Id.* at p. 28.) "[D]efendants cannot be charged with *ex post facto* liability for conspiratorial taking in which they did not participate." (*Ibid.*)

Kidron relies heavily on *de Vries* v. *Brumback* (1960) 53 Cal.2d 643 [2 Cal.Rptr. 764, 349 P.2d 532]. *de Vries* involved a conspiracy to dispose of property stolen from a jewelry store. A few hours after the robbery occurred, but *before* all the stolen property had been received from the robbers, defendant Brumback was contacted and agreed to participate in converting and disposing of the stolen property. (*Id.*, at pp. 646, 647.) The Supreme Court held the conspiracy was ongoing at the time Brumback joined because all the stolen property had not yet been received. (*Id.*, at pp. 647-648.) On that basis, the court held Brumback liable for all of the property stolen.

Contrary to Kidron's interpretation, *de Vries* does not support his argument that MAC can be deemed a conspirator because it agreed to distribute *Catwalk*. Unlike the conspirator in *de Vries*, MAC did not join with Franklin/Waterman while the underlying tort was continuing. As a matter of law, the alleged conspiracy to defraud was completed and actionable when Franklin/Waterman obtained control of the *Catwalk* concept. This occurred at the latest by May 1992, when Kidron allegedly was excluded from further participation in the production of *Catwalk*. By the time MAC received notice of Kidron's fraud claim in October 1992, five months had elapsed since the last tortious act had taken place. MAC could not join in a conspiracy that had been completed.

Kidron also relies on *Peterson* v. *Cruickshank* (1956) 144 Cal.App.2d 148 [300 P.2d 915]. *Peterson* involved allegations of conspiracy to falsely imprison, based on the knowing participation of numerous individuals and a sanitarium. The Court of Appeal found that although defendant Cruickshank was not directly involved in the physical restraint of plaintiff in the sanitarium (as were the physician and the sanitarium), Cruickshank could be held liable as a coconspirator because he agreed to pay the defendant physician and sanitarium for their ongoing services, thereby encouraging and participating in plaintiff's unlawful confinement. Thus *Peterson* merely stands for the proposition that a defendant who assists in an *ongoing* tort may be held

liable as a coconspirator. *Peterson* is not analogous to the facts underlying Kidron's claim, which point clearly to a tort that was completed months before MAC began its efforts to distribute *Catwalk.*

Unlike the analogies to the "fence" in *de Vries* or the billpayer in *Peterson,* the *Maheu, Davis and Longstreth* cases are more appropriately on point on the issue of a misappropriation of intellectual property. As those cases illustrate, a party that publishes or distributes a fraudulently obtained intellectual property cannot be implicated as a coconspirator with the party that stole the property. In the instant case, MAC's agreement to distribute *Catwalk* was lawful and occurred long after Franklin/Waterman's wrongdoing. MAC, therefore, cannot be deemed a coconspirator in an already completed tort.

## F. *MAC's Motion for Nonsuit Was Made and Granted on a Correct Legal Premise.*

Kidron argues that the motion was made and granted on an erroneous legal premise. MAC's memorandum of points and authorities in support of its motion for nonsuit correctly summarized the principles of law governing conspiracy. Additionally, the trial court entertained lengthy argument from counsel, in which Kidron had an opportunity to reiterate every purported "fact" that he believed supported an inference that MAC had conspired with Franklin/Waterman to defraud Kidron. The court correctly concluded that Kidron had failed to introduce evidence sufficient to support a jury verdict for Kidron.

Kidron's error arises from his incorrect premise that MAC argued (and the court adopted) a limited theory of liability, that is, that MAC could be held liable as a coconspirator only if there was evidence to show (1) that the purpose of the Distribution Agreement was to defraud plaintiffs, and (2) that MAC entered into the Distribution Agreement with the knowledge that its purpose was to defraud plaintiffs. By suggesting that MAC and the court assumed that the conspiracy could arise only out of MAC's entering into the Distribution Agreement, Kidron is attempting to manufacture error where none occurred.

The record reflects that MAC correctly argued that a conspiracy could arise only out of an agreement (unspecified) between MAC and another defendant with the knowledge that the purpose of that agreement was to defraud plaintiffs. MAC did not limit the scope of its argument to whether its execution of the Distribution Agreement constituted conspiracy; rather, MAC asserted that there had been no evidence of any agreement with any defendant to defraud Kidron.

The transcript of the oral argument of the motion reveals that neither the court nor Kidron's counsel confined their attention to the narrow scope now suggested by Kidron on appeal. At trial, Kidron's counsel raised all of the purported "facts" that are raised on appeal: payment of the deposit, MAC's inquiries about chain of title, establishment of the letter of credit and MAC's reasons for refusing to accept delivery. MAC's counsel then addressed the inferences (or lack thereof) that could logically be drawn from this evidence. Following both counsel's responses to questions from the court, the court concluded that Kidron's "smoking guns really aren't smoking." Correctly rejecting Kidron's counsel's proposition that "[t]he teeniest wisp of smoke is enough to get me past the nonsuit," the court granted MAC's motion.

Additionally, Kidron's speculation that the trial court could have based its ruling on the nonsuit on MAC's refusal to distribute *Catwalk* is unfounded. The record reflects that the court ruled in MAC's favor because of a lack of evidence of wrongdoing, not because of any particular actions taken by MAC. Moreover, as discussed above, MAC's refusal to accept delivery of *Catwalk* was consistent with MAC's position when it first learned of the Kidron dispute: without good chain of title, MAC was not going to distribute *Catwalk*. Thus, to the extent that the trial court included MAC's refusal to distribute *Catwalk* in its decision to grant the nonsuit, the trial court's decision is, once again, well founded.

## G. *Kidron's Conspiracy-to-Breach-Fiduciary-Duty Claim Fails Because MAC Owed No Fiduciary Duty to Kidron nor Assisted Franklin/Waterman in Breaching Its Duty.*

It is undisputed that MAC owed no fiduciary duty to Kidron. Unable to successfully charge MAC with a direct breach of fiduciary duty, therefore, Kidron unsuccessfully attempted to prove at trial that MAC had conspired with Franklin/Waterman to breach whatever duty Franklin/Waterman owed to Kidron. Kidron's claim founders on the same lack of supporting fact and law that defeats his conspiracy to defraud claim against MAC.

Even if Kidron had introduced factual evidence related to its breach of fiduciary claim against MAC, this claim fails as a matter of law. ■ A nonfiduciary cannot conspire to breach a duty owed only by a fiduciary. "Conspiracy is not an independent tort; it cannot create a duty . . . . It allows tort recovery only against a party who already owes the duty . . . based on applicable substantive tort law principles." (*Applied Equipment Corp.* v. *Litton Saudi Arabia Ltd., supra,* 7 Cal.4th at p. 514.)

A nonfiduciary as well as a fiduciary owes a duty not to engage in *actual* fraud, but only a fiduciary owes a duty not to engage in *constructive* fraud.

"Constructive fraud allows conduct insufficient to constitute actual fraud to be treated as such where the parties stand in a fiduciary relationship." (*Estate of Gump* (1991) 1 Cal.App.4th 582, 601 [2 Cal.Rptr.2d 269]; accord, *Salahutdin* v. *Valley of California, Inc.* (1994) 24 Cal.App.4th 555 [29 Cal.Rptr.2d 463].) Accordingly, a party who is not in a fiduciary relationship with the plaintiff cannot be held liable for conspiracy to commit constructive, as opposed to actual fraud. (*Younan* v. *Equifax Inc.* (1980) 111 Cal.App.3d 498, 515-517 [169 Cal.Rptr. 478] [insurance claims investigation company and company's employee not liable for conspiracy to commit constructive fraud because fiduciary duty was owed only by insurer itself]; *Skarbrevik* v. *Cohen, England & Whitfield* (1991) 231 Cal.App.3d 692, 711 [282 Cal.Rptr. 627] ["an attorney will not be liable for conspiracy to commit *constructive* fraud where that charge rests on a fiduciary duty of disclosure owed only by the client" (original italics)].)

The Supreme Court discussed the *Younan* case with approval in *Applied Equipment Corp.* v. *Litton Saudi Arabia Ltd., supra,* 7 Cal. 4th at pages 512-513: "In *Younan* plaintiff alleged a conspiracy among his insurer and two of the insurer's agents to deprive plaintiff of disability insurance benefits. According to plaintiff, defendants falsely represented that plaintiff would be examined by a medical doctor who would objectively consider plaintiff's claim for benefits. The truth, in plaintiff's view, was that defendant had arranged for plaintiff to be examined by a psychiatrist who had agreed in advance with defendants to render a false report for thepurpose of justifying the insurer's similarly preconceived decision to *deny* benefits. The agents were held *subject to liability for actual fraud* because they shared with the insurer the 'duty to abstain from injuring the plaintiff through express misrepresentation,' but were *relieved of liability for constructive fraud* because that claim 'rested on a fiduciary duty of disclosure which was owed plaintiff only by the insurer itself.' " (Italics added.)

Kidron does not suggest that MAC itself owed him a fiduciary duty, so MAC cannot be subject to liability for conspiracy to commit constructive fraud. Yet Kidron broadly accuses MAC of conspiracy to breach fiduciary duty, without distinguishing between constructive fraud and actual fraud. If Kidron's conspiracy-to-breach-fiduciary-duty claim is limited to conspiracy to commit actual fraud, as it must be, then the conspiracy-to-breach-fiduciary-duty claim has no independent significance. It duplicates Kidron's conspiracy-to-defraud claim, which we find to be meritless.

## V

### DISPOSITION

The judgment is affirmed. Respondents to recover costs of appeal.

Lillie, P. J., and Johnson, J., concurred.

A petition for a rehearing was denied January 8, 1996, and appellants' petition for review by the Supreme Court was denied March 14, 1996.