Filed 4/25/14  R City v. Security Building Loft Partners CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| R CITY, INC.,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>SECURITY BUILDING LOFT<br>PARTNERS et al.,<br><br>    Defendants and Respondents. | B246119<br><br>(Los Angeles County<br>Super. Ct. No. BC441922) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard E. Rico, Judge.  Affirmed.

The Moore Law Team, Thomas E. Moore III and Nicole V. Economou for Plaintiff and Appellant.

Lewis Brisbois Bisgaard & Smith, Jeffrey A. Miller, Brittany H. Bartold and Greta A. Katz for Defendants and Respondents.

\* \* \* \* \* \*

Plaintiff R City, Inc. (R City), appeals a final judgment in favor of defendants and respondents Security Building Loft Partners, L.P. (SBLP) and Simpson Housing, L.P. (together the Landlord Defendants), based on the trial court's grant of summary adjudication on R City's claims for intentional and negligent interference with economic relations and a directed verdict against R City on its remaining claims for conversion, theft, and negligence.  We affirm.

**BACKGROUND**

This case arose on July 3, 2010, at 3:00 a.m., when R City was dispossessed of a wine bar it operated in downtown Los Angeles for a year and a half called "The Must Wine Bar."  Several years before R City moved in, SBLP entered into a lease with a tenant named Weeneez, LLC (Weeneez), which began operating two concepts in the space:  a hot dog restaurant and an art gallery.  Signed in June 2005, the lease was set to expire on January 31, 2012, with a five-year extension option Weeneez could exercise.  As relevant to this appeal, the lease contained a provision voiding any subleases entered without the prior written consent of SLBP:  "Tenant shall not, voluntarily or by operation of law, assign, sell, convey, sublet or otherwise transfer all or any part of Tenant's right or interest in this Lease, or all [*sic*] any other person or entity to occupy or use all or any part of the Premises (collectively called 'Transfer') without first obtaining the written consent of Landlord, which consent shall not unreasonably be withheld, conditioned or delayed.  Any Transfer without the prior written consent of Landlord shall be void and shall, at the election of the Landlord, be a Default."

The lease defined a "transfer" to include "(a) an entity or person other than Tenant becoming the tenant hereunder by assignment, merger, consolidation, dissolution, or reorganization; (b) a transfer of any ownership interest in Tenant (unless Tenant is an entity whose stock is publicly traded) which (itself or in a combination with all previous Transfer [*sic*]) changes ownership in Tenant by 25%

2

or more or results in a change in the current control of Tenant; (c) a grant of a license, concession, or other right of occupancy of any portion of the Premises; or (d) the use of the Premises by any party other than Tenant." The lease also provided, in the event of a sublease or transfer, SLBP would be entitled to any rents collected by Weeneez exceeding its rent paid to SLBP; the option to extend the lease would be "null and void"; any sublease would be "subordinate and subject to" the provisions in the lease; and if the lease was terminated during the term of any sublease, SLBP had the right to treat the sublease as cancelled and repossess the premises or require the subtenant to pay the rental rate under the sublease while being subject to the terms of the lease.

Weeneez began looking for an investor in 2007. It first initiated a relationship with an individual named Michael Franz, who received a 10 percent ownership interest in Weeneez, but Franz abandoned the deal in September 2008. On November 5, 2008, Weeneez and R City entered into an agreement governing R City's right to occupy just over half of Weeneez's leased space for operating The Must Wine Bar (hereafter the Operating Agreement). Under the Operating Agreement, Weeneez granted R City "an exclusive, non-transferable, and non-sub-licensable right" to operate The Must Wine Bar on the premises until January 31, 2012, i.e., the end of the initial lease term. In exchange, R City paid Weeneez $30,000 for a 10 percent ownership interest in Weeneez, plus a $4,000 per month "working capital payment" that would increase in direct proportion to Weeneez's rent under the lease. R City would keep its profits and pay a proportionate share of utilities. Further, if Weeneez exercised its option under the lease to extend its term, R City was given the opportunity to extend the Operating Agreement for the same period. If Weeneez did not exercise its extension option, R City had a right of first refusal to do so. Conversely, the Operating Agreement would "automatically terminate" upon any termination of the lease. The Operating Agreement declared the parties were "independent contractors. There is no relationship of agency,

3

partnership, joint venture, employment, or franchise between the parties. Neither party has authority to bind the other or incur any obligation on behalf of the other."

The Operating Agreement required Weeneez to modify its Alcoholic Beverage Control 41 license (the ABC 41 license) to support R City's sales of beer and wine at The Must Wine Bar. In reliance on this provision, R City began buying beer and wine under Weeneez's ABC 41 license. However, Weeneez never perfected an ABC 41 license covering The Must Wine Bar's purchase and sales of alcoholic beverages, however.

The Operating Agreement did not refer to the parties' relationship as a sublease and Meroojohn Ordubedgian, R City's president at the time who negotiated the Operating Agreement, explained in a contemporaneous e-mail to Weeneez's CEO Sid Carter, "The operating agreement is good for just getting around the lease. Other then [*sic*] that it will not hold up in a court of law if we are sued." At trial, Ordubedgian testified Weeneez was experiencing financial difficulties and he believed Carter was trying to avoid a sublease so he would not have to give the Landlord Defendants some of the rents from a sublease. Carter testified he would never have created a subtenant relationship in "clear violation" of the master lease.

In anticipation of opening The Must Wine Bar, R City spent more than $250,000 on construction and furniture to improve the premises, with no contribution from Weeneez. The Must Wine Bar opened in January 2009 and by the middle of 2009, it was consistently profitable, with revenues between $100,000 and $120,000 per month from wine, beer, and food sales.

In March 2009, Weeneez sent SLBP a partially executed copy of the Operating Agreement. Sharon Lee of SLBP[1] wondered if the deal had already been completed and expressed confusion over whether the Operating Agreement might

---

[1] In July 2010, Sharon Lee changed her name from Sharon Reynolds. We will refer to her by her current name of Lee.

4

have created a sublease. She noted if a sublease was created, profits from it belonged to SLBP. She also pointed out the provision in the Operating Agreement allowing R City to exercise the extension option in Weeneez's place was inconsistent with the terms of the lease declaring the extension option void in the event of a sublease.

By June 2009, SLBP was still discussing the "sublease" situation and requested R City to list it as an additional insured on R City's insurance. Rachel Thomas of R City also contacted SLBP, indicating it was "sublet[ting]" from Weeneez. Lee told Thomas R City was not allowed to sublease the space. According to Thomas, an SLBP representative visited The Must Wine Bar and saw it and the Weeneez restaurant operated in separate spaces.

In September 2009, Carter of Weeneez wrote to Lee requesting a lengthy extension of the lease. In response, Lee requested Weeneez provide proof of valid liquor liability insurance, and noted the insurance certificate SLBP recently received for The Must Wine Bar was not sufficient because "The Must Wine Bar is not our tenant." Lee also asked whether The Must Wine Bar was "occupying space under Weenez, LLC [*sic*] or as a sub-lease tenant? A transfer of any kind is prohibited under your current lease agreement unless you have received prior written consent by landlord. It is imperative that we have a solid understanding of who Weenez, LLC [*sic*] is and what its current financial strength looks like in order to consider any extension of the term." Lee later explained this discussion was intended to clarify the relationship among Weeneez, Franz (Weeneez's former investor), and R City.

Carter responded with a detailed justification for not considering R City a subtenant. He explained Franz had since terminated his participation in Weeneez and R City made an investment in Weeneez in exchange for 10 percent equity in the business. Thus, "R City is currently operating The Must [Wine Bar] under Weeneez LLC. Section 3 of the [Operating Agreement] clearly states that R City is an investor in Weeneez LLC, not a sub-tenant. The agreement between Weeneez and R City is unequivocal on this point." Carter pointed out certain provisions in the Operating

5

Agreement that would not have been included in a subtenant agreement, and he noted a sublease would have precluded Weeneez and R City from sharing a kitchen under Los Angeles County rules and regulations, which they were doing.

In late 2009, R City discovered online advertisements indicating Weeneez was selling a "turnkey restaurant and bar," giving the mistaken impression R City's business was for sale, and that Weeneez was showing the space to potential buyers. R City informed SLBP of the situation, but SLBP did not believe there was anything it could do. R City's attorney wrote to Weeneez and demanded arbitration to stop Weeneez from showing the space to potential buyers and to resolve issues surrounding the liquor license, which had been ongoing. Thomas notified Lee of these issues and claimed R City was Weeneez's subtenant. Lee asked for a copy of any subtenancy agreement, but Thomas only produced the Operating Agreement. Lee did not believe R City was a subtenant because SLBP did not consent to the sublease and there was no written sublease agreement.

In early 2010, Weeneez contacted a business broker to sell its business and approached SLBP about terminating its lease early in favor of a proposed buyer, David McGrath and his company, D&M Restaurant Group, Inc. (D&M). SLBP asked whether The Must Wine Bar would continue to operate in the space and again wanted clarification whether Franz and R City had each terminated any "partnership" with Weeneez. If not, SLBP wanted to know whether they were "on-board or against the sale of Weeneez" because SLBP was "not interested in getting tied up in the middle of a business dispute between partners in Weeneez, LLC." SLBP eventually expressed significant concern about the relationship between R City and Weeneez, noting SLBP "cannot be placed in the position of solving [Weeneez's] internal business issues with R City."

In response to these concerns, Weeneez explained its Operating Agreement with R City would expire on the execution of a new lease and McGrath did not intend to execute a new agreement with R City. Weeneez represented it was in settlement

6

discussions with R City over its ownership interest. The proposed purchase agreement included all of Weeneez's assets and excluded R City's inventory.

A few weeks later, R City contacted SLBP about a battery that had occurred at The Must Wine Bar. SLBP told R City to provide an incident report to the site manager because one was required in order to notify SLBP's insurer of the incident. Thomas believed this was necessary because SLBP regarded R City as a subtenant. After this incident, SLBP did not have further direct contact with R City.

Eventually, SLBP and Weeneez executed a lease termination agreement, in which Weeneez represented it had not assigned or conveyed any of its rights under the lease. In an initial draft of this agreement, the lease was scheduled to end on July 3, 2010, with a default time of midnight. Weeneez requested the lease instead terminate at 2:59 a.m. and D&M's new lease start at 3:00 a.m.; it also explained there would be an "informal 'transition period' period from 3:00 a.m. until later that morning to allow Weeneez to remove personal property not included in the sale." When SLBP inquired why that time was necessary, Weeneez explained that would be the best time to avoid parking issues and avoid interruption with the opening and closing of The Must Wine Bar, which stayed open until 2:00 a.m. SLBP and Weeneez also executed an agreement requiring Weeneez to indemnify SLBP against any claims by R City and requiring Weeneez to deposit $37,500 into an escrow account.[2]

SLBP executed a new lease with D&M as the tenant in the space occupied by the Weeneez restaurant and The Must Wine Bar. As part of that lease, the Landlord Defendants obtained "triple net" terms that shifted certain costs to D&M, which was not a feature of the lease with Weeneez.

At 3:00 a.m. on July 3, 2010, representatives of D&M and Weeneez removed

---

[2] D&M and Weeneez also executed an agreement whereby Weeneez would indemnify D&M against any claims by R City.

R City's personal property from The Must Wine Bar and placed it in storage, posted certain notices, changed the locks, and padlocked the doors with other furnishings still inside. R City did not know The Must Wine Bar was going to be closed or its property removed.[3]

Based on these acts, R City filed a complaint against Weeneez, McGrath, the Landlord Defendants, and Lee, among others, for (1) conversion, (2) possession of personal property, (3) theft, (4) fraudulent concealment, (5) intentional interference with economic relationship, (6) negligent interference with economic relationship, (7) trespass, (8) unfair competition against McGrath and (9) negligence. Because the Landlord Defendants did not personally participate in the removal of R City's property, R City alleged the Landlord Defendants engaged in a conspiracy to keep the removal secret from R City and to participate in the planned conversion of R City's property.

The Landlord Defendants filed a motion for summary adjudication of R City's claims for intentional and negligent interference with economic relations, which the trial court granted. The court implicitly adopted the Landlord Defendants' position R City's damages for these claims were limited to lost profits, and the court found any lost profits were speculative on two grounds. First, R City did not offer sufficient evidence to establish it had a sublease because the undisputed facts demonstrated the lease required written consent for any sublease and the "purported notice to the Landlord and emails in which the Landlord inquired about the existence of a sublease are insufficient as a matter of law as they do not constitute written

---

[3]     R City claims the Landlord Defendants' staff at the building did not know the transition would take place, but the portion of the trial transcript R City cites does not support this point. At trial, Thomas testified the Landlord Defendants' property manager was "surprised" the locks had been changed, but when she was asked whether he knew in advance of the planned removal of R City's property, an objection to the question was sustained and Thomas did not answer.

consent by the Landlord as required by" the lease. Second, R City did not have a valid liquor license and R City did not provide evidence that The Must Wine Bar could have operated on food sales alone, without the sale of alcohol.

The Landlord Defendants later filed a motion for summary judgment or summary adjudication on the remaining claims, which the trial court granted in part and denied in part. It granted the motion on R City's claims for trespass and fraudulent concealment based on R City's concession it could not prove those claims in light of the court's prior ruling that it had no sublease. The court also granted the motion as to Lee in her individual capacity. The court denied the motion on R City's conversion, possession of personal property, and theft claims, listing a number of facts raising a triable issue whether the Landlord Defendants were aware R City's inventory was going to be taken. Those facts included that the lease terminated at 3:00 a.m.; Weeneez intended to remove personal property from premises not included in the sale, which would have included some of R City's property; the Landlord Defendants knew R City had spent $250,000 on renovations; R City had complained Weeneez tried to sell The Must Wine Bar without R City's consent; and the unusual prefunded indemnity agreement between the Landlord Defendants and Weeneez protecting the Landlord Defendants from any claims by R City. The court also denied the motion for R City's negligence claim based on the same facts, reasoning the Landlord Defendants had a duty to refrain from participating in the plan to deprive R City of its property. The court found triable issues of fact on the Landlord Defendants' claim R City was the wrong entity sued and rejected the Landlord Defendants' unclean hands defense as unrelated to R City's conversion-based claims.

A jury trial commenced on R City's conversion, theft, and negligence claims. After the close of evidence, the trial court granted the Landlord Defendants' motion for a directed verdict, concluding they owed no duty to R City and R City failed to

put forward evidence of a conspiracy in which the Landlord Defendants participated. The court entered judgment against R City and R City timely appealed.

## DISCUSSION

### A. *Directed Verdict*

#### 1. *Legal Standard*

"'[A] motion for a directed verdict is in the nature of a demurrer to the evidence. [Citations.] . . . A directed verdict may be granted only when, disregarding conflicting evidence, giving the evidence of the party against whom the motion is directed all the value to which it is legally entitled, and indulging every legitimate inference from such evidence in favor of that party, the court nonetheless determines there is no evidence of sufficient substantiality to support the claim or defense of the party opposing the motion, or a verdict in favor of that party. [Citations.]' [Citation.] On appeal we apply the substantial evidence standard of review." (*Eucasia Schools Worldwide, Inc. v. DW August Co.* (2013) 218 Cal.App.4th 176, 180-181.)

#### 2. *Conversion and Theft Claims*

Because the Landlord Defendants did not personally convert R City's property, R City's theory of liability for conversion and theft against them rested on allegations of civil conspiracy.[4] To impose liability on a theory of civil conspiracy, R City must prove (1) the formation and operation of a conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) damages arising from the wrongful conduct. (*Kidron v. Movie Acquisition Corp.* (1995) 40 Cal.App.4th 1571, 1581 (*Kidron*).) The conspirators must "'agree[] to a common plan or design to commit a tortious act'" with "actual knowledge that a tort is planned and concur in the tortious

---

[4] The parties do not treat civil theft and conversion as different torts, nor shall we.

10

scheme with knowledge of its unlawful purpose." (*Id.* at p. 1582.) But actual knowledge alone is insufficient; conspirators must also intend to agree and intend to commit the target tort. (*Id.* at p. 1587.)

"While knowledge and intent 'may be inferred from the nature of the acts done, the relation of the parties, the interest of the alleged conspirators, and other circumstances' [citation], '"[c]onspiracies cannot be established by suspicions. There must be some evidence. Mere association does not make a conspiracy. There must be evidence of some participation or interest in the commission of the offense."' [Citation.] An inference must flow logically from other facts established in the action." (*Kidron, supra*, 40 Cal.App.4th at p. 1582; see *Choate v. County of Orange* (2000) 86 Cal.App.4th 312, 333 [describing plaintiff's burden to prove conspiracy as "weighty" and "'[b]are' allegations and 'rank' conjecture do not suffice for a civil conspiracy"].) However, "[t]acit consent as well as express approval will suffice to hold a person liable as a coconspirator." (*Wyatt v. Union Mortgage Co.* (1979) 24 Cal.3d 773, 785 (*Wyatt*).)

Civil conspiracy is not independently actionable; it simply imposes liability on individuals who do not commit a tort themselves but who share with the tortfeasors a common plan to commit a tort. (*Kidron, supra*, 40 Cal.App.4th at p. 1581; see *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 510-511.) Here, R City based its conspiracy claim on conversion, which required R City to establish "(1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages." (*Burlesci v. Petersen* (1998) 68 Cal.App.4th 1062, 1066.)

R City argues there was evidence of a "tacit" agreement between the Landlord Defendants and Weeneez and D&M to convert R City's property based on the Landlord Defendants' "wholesale adoption of Carter's view that R City was a 'partner' whose rights could be terminated, the Landlord Defendants' acceptance of a prefunded indemnity agreement in lieu of a R City settlement, the silence about the

11

pending transactions in the Landlord Defendants' dealings with R City and the Landlord Defendants' apparent failure to inform the on site manager . . . of the impending change in tenancy." R City also points to the Landlord Defendants' financial interest in terminating Weeneez's lease for a more favorable "triple net" lease with D&M.

This was not substantial evidence supporting an inference the Landlord Defendants knew Weeneez and D&M intended to convert R City's personal property and intended to assist in the planned conversion during the lease transition. The Landlord Defendants certainly approved the termination of Weeneez's lease at 3:00 a.m. on July 3, 2010, knowing the Operating Agreement between Weeneez and R City would also terminate, and as a result, R City and The Must Wine Bar would almost surely be required to vacate the space. But that does not create an inference that the Landlord Defendants knew a *conversion* would occur and agreed to it. When R City's property was removed, no representative from the Landlord Defendants was at the premises, and neither Weeneez nor D&M told the Landlord Defendants R City's property would be removed at that time. At best, the Landlord Defendants knew Weeneez was selling all the assets of "Weeneez LLC" and Weeneez would be given an "informal 'transition period' period from 3:00 a.m. until later that morning to allow Weeneez to remove personal property not included in the sale." Weeneez explained 3:00 a.m. would be the best time to avoid parking issues and avoid interruption with the opening and closing of The Must Wine Bar. To Lee, this seemed like a reasonable explanation, although she was annoyed for having to redraft the termination agreement and the new lease to state the new time.

Both Carter of Weeneez and McGrath testified at trial they did not intend to convert R City's property when they removed it. Even if the jury disbelieved them, Lee testified without contradiction that no one expressed to the Landlord Defendants a plan to take R City's property. Nor was she ever told to conceal the lease negotiations with D&M from R City. She explained at trial she obtained the

12

indemnity agreement from Weeneez because she was aware of the disputes between Weeneez and R City, not because she anticipated Weeneez and D&M might commit a tort against R City. Indeed, she was informed Weeneez and R City were in settlement negotiations over R City's investment.

R City analogizes to *Wyatt*, but that case is readily distinguishable. There the Supreme Court found substantial evidence of a conspiracy among "a tightly knit, family-oriented business operation under [an individual appellant's] close personal control," and that appellant "owned all or a controlling interest in each of the affiliated corporations. Each of the other individual appellants was an officer or director of one or more of the corporations and each was active in some management position at some time during the years when the conspiracy is alleged to have occurred." (*Wyatt, supra*, 24 Cal.3d at p. 785.) Likewise, all the corporate appellants were headquartered in the same building (*id.* at p. 786), and the evidence showed company-wide policies and instructions (*id.* at p. 785).

Here, there was no such "tightly knit" operation and no policies or instructions from the Landlord Defendants to remove, let alone convert, R City's property. Instead, R City's theory that the Landlord Defendants entered a conspiracy to commit conversion rested on suspicions and speculation arising purely from the their involvement in the lease transition with Weeneez and D&M, not reasonable inferences drawn from the evidence. Thus, the trial court properly granted a directed verdict to the Landlord Defendants on R City's conversion and theft claims.

3. *Negligence*

To prove negligence, a plaintiff must establish duty, breach, causation, and damages. (*Smith v. Freund* (2011) 192 Cal.App.4th 466, 472.) The trial court's directed verdict ruling and the parties' arguments on appeal focus on whether the Landlord Defendants owed a duty of care to R City. The issue of duty is a question of law we review de novo. (*Pedeferri v. Seidner Enterprises* (2013) 216 Cal.App.4th 359, 364 (*Pedeferri*).)

13

"Our first step is to articulate the duty at issue." (*Pedeferri, supra*, 216 Cal.App.4th at p. 364.) R City concedes the Landlord Defendants would not normally be liable for the torts committed by third parties, but argues the Landlord Defendants owed a duty to notify R City if they were "on notice that some other person will violate the law," citing CACI No. 411 and *Bigbee v. Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 58 (*Bigbee*). CACI No. 411 states: "Every person has a right to expect that every other person will use reasonable care and will not violate the law, unless he or she knows, or should know, that the other person will not use reasonable care or will violate the law." (Brackets omitted.) Stated somewhat differently, "'[i]f the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby.' [Citations.]" (*Bigbee, supra*, at p. 58.)[5]

A foundational requirement of R City's theory is actual or constructive knowledge some other party would "violate the law." R City argues the Landlord Defendants had "ample reason to know" Weeneez and D&M planned to violate the law because they "were seeking to close a fraudulent sale of R City's business to McGrath, to dispossess R City and to convert its property." But this formulation is too broad. In the trial court, R City did not seek to impose liability on the Landlord

---

[5]    The Landlord Defendants offer a different formulation of duty, citing the rule that "[r]ecognition of a duty to manage business affairs so as to prevent purely economic loss to third parties in their financial transactions is the exception, not the rule, in negligence law. Privity of contract is no longer necessary to recognition of a duty in the business context and public policy may dictate the existence of a duty to third parties." (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 58 (*Quelimane*).) *Quelimane* then lists a number of factors to consider in determining whether a duty exists in a particular case. (*Ibid.*) We need not decide whether the Landlord Defendants' formulation applies because, even assuming R City's theory applies, it was not satisfied in this case.

14

Defendants based on a fraudulent sale of R City's business. Instead, R City's theory of duty rested on the Landlord Defendants' actual or constructive knowledge of the planned conversion of R City's property. In its complaint, R City alleged the Landlord Defendants, "having been put on notice of R City's rights under the [Operating Agreement] as well as the desire of the Weeneez' Principals to dispossess R City secretly and at night, owed R City a duty of reasonable care: (i) to investigate R City's rights fully, (ii) to refrain from participating in any conduct that would infringe the rights for which they had notice, and (iii) to exercise due care with respect to the personal property." In denying summary adjudication of this claim, the trial court explained, "Plaintiff is not arguing that Defendants had a duty of care to 'not enter into a new lease agreement,' but that Defendants owed a duty of care to refrain from participating in conduct that would infringe on Plaintiff's rights of which Defendants had notice. The alleged misconduct at issue is Defendants' alleged participation in a conspiracy to deprive Plaintiff of possession of its personal property." Likewise, in opening statements, R City argued its damages for both its negligence and conversion claims were "the value of the property that was taken, ruined, destroyed. And that would be in the neighborhood of $150,000." And in the arguments regarding the directed verdict, the Landlord Defendants' attorney stated the duty issue "comes down to what occurred on July 3, 2010, when the personal property of R City . . . was removed from the premises." In response, R City's attorney did not correct that statement, but argued the Landlord Defendants "either knew or should have known that Carter and McGrath were prepared to violate the law."

With the relevant question properly framed, we find the Landlord Defendants owed no duty to R City because they had no reason to know Weeneez and D&M planned to violate the law by converting R City's property. R City relies on the following facts: Thomas complained to the Landlord Defendants that Weeneez was trying to sell its business on a "turnkey basis"; the Landlord Defendants knew R City

15

had invested $250,000 in The Must Wine Bar; Weeneez told the Landlord Defendants the Operating Agreement with R City would terminate when the lease terminated; R City did not know about the sale of Weeneez to McGrath and D&M; Weeneez prefunded an indemnity agreement with the Landlord Defendants; and Weeneez and D&M wanted to terminate the lease at 3:00 a.m. on July 3, 2010. As with R City's conspiracy claim, none of these facts would have put a reasonable person in the Landlord Defendants' position on notice that Weeneez and D&M planned to *convert* R City's property while transitioning the lease. Without constructive knowledge of the impending violation of the law, the Landlord Defendants did not owe any duty to R City. Thus, the trial court properly granted a directed verdict on this claim.[6]

## B. *Summary Adjudication*

"Summary judgment or summary adjudication is appropriate when no triable issue of material fact remains and the moving party is entitled to judgment or adjudication as a matter of law. [Citations.] A trial court's decision on a motion for summary judgment or summary adjudication is reviewed de novo, viewing the evidence in the light most favorable to the nonmoving party. [Citations.]" (*Conejo Wellness Center, Inc. v. City of Agoura Hills* (2013) 214 Cal.App.4th 1534, 1548; see Code Civ. Proc., § 437c, subds. (c), (f).)

The trial court granted summary adjudication on R City's claims for intentional and negligent interference with economic relations because it found R City's damages were limited to lost profits and any lost profits were speculative on two grounds: R City did not have a sublease with the Landlord Defendants and

---

**6**     R City argues its negligence claim would be stronger if it were a subtenant of Weeneez. As explained below, we find no triable issue of fact on that point, rendering this argument moot.

16

R City did not have a valid liquor license. We find summary adjudication proper on the first ground, so we need not address the second.

To establish intentional or negligent interference with economic relations, a plaintiff must prove economic harm caused by a defendant's wrongful intentional or negligent conduct independent of the interference. (See *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1153 [intentional interference]; *Venhaus v. Shultz* (2007) 155 Cal.App.4th 1072, 1078 (*Venhaus*) [negligent interference].) Generally, the measure of damages for interference claims is "'an amount that will reasonably compensate plaintiff for all loss or harm, provid[ed] [the jury] find[s] it was [or will be] suffered by plaintiff and caused by the defendant's conduct.'" (*Sole Energy Co. v. Petrominerals Corp.* (2005) 128 Cal.App.4th 212, 232.) One common form of damages for these kinds of business torts is lost profits. (See *Parlour Enterprises, Inc. v. Kirin Group, Inc.* (2007) 152 Cal.App.4th 281, 287 ["'Damage awards in injury to business cases are based on net profits,'" (Quoting *Electronic Funds Solutions LLC v. Murphy* (2005) 134 Cal.App.4th 1161, 1180.)]; see also *Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 883.) Any damages must be reasonably certain and cannot be "'speculative, remote, imaginary, contingent, or merely possible.'" (*Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 989.)

To conclude R City's lost profits damages were speculative, the trial court found no sublease existed because the master lease provided that any sublease without written consent of the Landlord Defendants was "void and shall, at the election of the Landlord, be a Default," and no triable issue of material fact that the Landlord Defendants did not consent in writing to a sublease with R City. R City attempts to get around this conclusion with a two-step argument. First, it argues notwithstanding the terms of the master lease, the facts raised a triable issue whether the Landlord Defendants' conduct created a landlord/subtenant relationship with

17

R City.  Second, because R City was a subtenant, the provision in the master lease declaring void any sublease without consent merely rendered the sublease *voidable* as a matter of law, requiring the Landlord Defendants to affirmatively declare the sublease forfeited, which the Landlord Defendants did not do.  (*People v. Klopstock* (1944) 24 Cal.2d 897, 901 (*Klopstock*); *Sexton v. Nelson* (1964) 228 Cal.App.2d 248, 258 (*Sexton*).)  R City's argument fails at both steps.[7]

R City cites the following evidence to argue a triable issue of fact existed over whether the Landlord Defendants' conduct created a landlord/subtenant relationship: the Landlord Defendants were given a copy of the Operating Agreement a year before terminating the master lease; the Landlord Defendants expressed concern about whether the Operating Agreement was a sublease; R City identified itself as a subtenant; a representative of the Landlord Defendants observed The Must Wine Bar and the Weeneez restaurant operating in separate spaces; the Landlord Defendants asked to be added to R City's insurance, which spread the risk of any loss among the Landlord Defendants, Weeneez, and R City; the Landlord Defendants asked R City to submit an incident report and certificate of insurance following a battery on the premises; the Landlord Defendants did not declare a default against Weeneez in light

---

[7]    According to R City, a landlord/subtenant relationship would have prevented the Landlord Defendants and Weeneez from voluntarily terminating the master lease without regard to R City's rights.  (See, e.g., *Buttner v. Kasser* (1912) 19 Cal.App. 755, 758 ["[A] tenant, who has made a valid sublease, may not by a voluntary surrender of his term defeat or affect the term of his subtenant, who has not consented to such surrender."]; see also *Chumash Hill Properties, Inc. v. Peram* (1995) 39 Cal.App.4th 1226, 1233 ["California law has long held that a tenant's surrender of his estate to the landlord does not destroy the estate of the underlessee if the tenant has made an underlessee." (Citing *Buttner*.)])  R City also argues a landlord/tenant relationship would have created a duty of good faith and fair dealing. (See, e.g., *Northridge Hospital Foundation v. Pic 'N' Save No. 9, Inc.* (1986) 187 Cal.App.3d 1088, 1100-1101.)  Because R City's argument fails for other reasons, we assume, without deciding, a landlord/tenant relationship would have created these rights.

of the Operating Agreement; and the Landlord Defendants terminated the master lease when it suited them.

These facts, even if true, could not have created a de facto landlord/subtenant relationship between R City and the Landlord Defendants. The Landlord Defendants' actions must be considered against the backdrop of the Operating Agreement, which plainly did not create a sublessor/sublessee relationship between R City and Weeneez, as Weeneez explained to the Landlord Defendants in detail. "It is well recognized that no particular legal terminology is required in the making of a lease, but it is essential that the instrument show an intention to establish the relationship of landlord and tenant." (*Beckett v. City of Paris Dry Goods Co.* (1939) 14 Cal.2d 633, 636.) While the Operating Agreement required monthly "working capital" payments similar to monthly rent and Weeneez once referred to R City's payment as "rent," the agreement itself did not identify R City as a tenant or subtenant and used no language to suggest it was creating a sublease. This was by design. The parties avoided creating a sublease in light of the forfeiture clause in the master lease. R City's representative admitted the Operating Agreement sought to "get[] around the lease" and Weeneez would have never created a sublease in "clear violation" of the master lease. Nor did Weeneez or R City seek the Landlord Defendants' written consent for a sublease, which itself is strong evidence they did not intend to create a sublease.

In light of these facts, the Landlord Defendants' had no reason to question Weeneez's representations that the Operating Agreement was not a sublease, and none of R City's additional facts would be probative of a de facto landlord/subtenant agreement. The fact that the Weeneez restaurant and The Must Wine Bar operated in separate spaces is entirely consistent with R City being an investor in Weeneez. That the Landlord Defendants did not affirmatively declare a default under the master lease was unsurprising, since Weeneez represented no sublease had been created. And R City's later claim it was a subtenant was self-serving and inconsistent with the

19

Operating Agreement and both R City's and Weeneez's understanding of it. The only potentially probative fact was the Landlord Defendants' request to be added to R City's insurance and request for R City to submit an incident report and certificate of insurance following the on-premises battery, but again, against the backdrop of the Operating Agreement, these acts were entirely consistent with treating R City as a Weeneez investor operating The Must Wine Bar on the property. Because the Landlord Defendants' conduct did not create a landlord/subtenant relationship, R City had no right to continue operating at the property and its lost profits damages were speculative.

Further, even if R City was a subtenant, its lost profits damages were still speculative. There was no dispute that, if R City had a sublease, it violated the master lease because the Landlord Defendants were not asked for, and did not give, written consent. Although the master lease declared all unauthorized subleases "void," R City cites *Klopstock* and *Sexton* to argue its alleged sublease was merely voidable at the election of the landlord, and here the Landlord Defendants did not take the extra step to declare the sublease forfeited. The Landlord Defendants argue *Klopstock* and *Sexton* do not apply because neither case involved a lease expressly declaring an unauthorized sublease "void," as does the master lease here.

We need not resolve this disagreement because, even if R City's purported sublease was voidable under *Klopstock* and *Sexton*, the Landlord Defendants could have at any time declared the sublease forfeited, extinguishing R City's right to stay at the premises. (*Klopstock, supra*, 24 Cal.2d at p. 901 ["The restriction as to the condition of assignment is a personal covenant for the benefit of the lessor and *until he elects to take advantage of the breach as authorized by law*, the assignment remains a valid and binding conveyance of the leasehold interest as to all other parties." (Italics added.)]; *Sexton, supra*, 228 Cal.App.2d at p. 258 ["The breach of a provision against assignment confers upon the lessor, *at his election*, the right to effect a forfeiture of the lease in the manner authorized by law." (Italics added.)].)

Because the Landlord Defendants had the right to evict R City from the property at any time as an unauthorized subtenant, R City's lost profits were purely speculative.[8]

Absent a sublease, R City claims it had an irrevocable right to remain at the premises as a licensee under the Operating Agreement because it spent money on improvements for The Must Wine Bar. This argument fails because any alleged license was with Weeneez, not the Landlord Defendants, who were not parties to the Operating Agreement. (See *Cooke v. Ramponi* (1952) 38 Cal.2d 282, 286 [explaining that, when a licensee has expended money in executing a license, the license "is declared to be irrevocable to prevent the *licensor* from perpetrating a fraud upon the licensee" (italics added)].)[9]

R City also argues it incurred other damages besides lost profits in the form of $250,000 in expenses for construction and furniture for The Must Wine Bar, which it claims it lost "as a result of the Landlord Defendants' interference with R City's business." But R City offered no evidence the loss of these *past* expenses was caused by the Landlord Defendants' alleged interference in R City's *prospective* business. (See *Venhaus, supra*, 155 Cal.App.4th at p. 1078 [explaining interference claim requires proof defendant's wrongful conduct "'caused damage to plaintiff in that the relationship was actually interfered with or disrupted and plaintiff lost in whole or in part the economic benefits or advantage reasonably expected from the

---

[8]    In its reply brief, R City suggests the Landlord Defendants waived their right to declare a forfeiture by accepting the benefit of R City's insurance coverage. But the master lease provided "[t]he receipt of any payment by Landlord from a party other than Tenant will not constitute consent to a Transfer." That sufficiently guarded against waiver here. (See *Karbelnig v. Brothwell* (1966) 244 Cal.App.2d 333, 341-342 [no waiver of right to declare forfeiture for accepting rents after breach of no-assignment clause because lease also provided acceptance of rents did not waive breach].)

[9]    R City also claims as a licensee it may sue for trespass, but its trespass claim was resolved against it on summary adjudication and it has not challenged that ruling on appeal.

21

relationship'"]; see also *Parlour Enterprises, Inc., supra*, 152 Cal.App.4th at p. 294 [defining proximate cause as "a reasonable probability the lost economic advantage would have been realized but for the defendant's wrongful acts"].) R City incurred those losses because Weeneez and D&M allegedly converted and otherwise improperly handled R City's personal property from The Must Wine Bar. That had nothing to do with the Landlord Defendants' alleged interference with any of R City's future business.

Thus, the trial court properly granted summary adjudication on R City's interference claims.

## DISPOSITION

The judgment is affirmed. Respondents are awarded costs on appeal.


FLIER, J.

WE CONCUR:



BIGELOW, P. J.



GRIMES, J.

22