Filed 8/13/21  Fletcher v. Cheung CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Nevada)

----

| | |
|---|---|
| TAL S. FLETCHER, JR., | C087884 |
| Plaintiff and Appellant, | (Super. Ct. No. TCU15-6234) |
| v. | |
| PAMELA CHEUNG et al., | |
| Defendants and Respondents. | |

Tal S. Fletcher sued Pamela Cheung along with her friend and financial advisor, Thomas Gubitosi, and two of Gubitosi's businesses, Tahoe Elite Private Car Service, Inc. (Tahoe Elite) and Marie Holdings, Inc. (Marie Holdings), asserting causes of action for: (1) fraud in the inducement of an agreement under which Fletcher sold a one-half interest in his private car service, Truckee Tahoe Transportation, Inc. (TTT), to Cheung for $100,000, half of which was to be paid in the form of a promissory note, (2) money owed on the promissory note, (3) intentional interference with prospective economic advantage,

1

(4) fraud in the inducement of an agreement to dissolve TTT and distribute its assets between Fletcher and Cheung, and (5) conversion of the assets Cheung received.[1]

Following a court trial, the trial court ruled Cheung fraudulently induced Fletcher to sell half of TTT's shares by making "many false representations about her financial wherewithal." However, aside from what Cheung owed on the promissory note, Fletcher did not prove damages attributable to Cheung's fraud. Fletcher was entitled to recover the total sum of $59,715.08 on the promissory note, plus reasonable attorneys' fees. Assuming Cheung fraudulently induced Fletcher to agree to dissolve TTT, the trial court ruled Fletcher again did not prove damages beyond what Cheung owed on the note. His causes of action for intentional interference with prospective economic advantage and conversion failed for reasons to be explained later in this opinion. With respect to Gubitosi, Tahoe Elite, and Marie Holdings (collectively, Gubitosi defendants), the trial court ruled none of Cheung's false statements were legally attributable to Gubitosi and Fletcher did not prove Cheung and the Gubitosi defendants entered into a conspiracy to defraud him.

Fletcher appeals, arguing: (1) the trial court's finding that Cheung and Gubitosi did not enter into a conspiracy to defraud Fletcher is not supported by substantial evidence; (2) the trial court also applied an incorrect legal standard in determining no conspiracy existed; (3) the trial court further ignored undisputed evidence establishing the existence of a conspiracy as a matter of law; (4) the Gubitosi defendants are also liable for fraud under other legal theories, Gubitosi as an aider and abettor, and his businesses under the doctrine of respondeat superior; (5) the trial court further erred in concluding Fletcher did not carry his burden of proving damages beyond the balance due on the

---

[1]    While separate causes of action, fraud and conversion were pleaded together under Fletcher's fourth cause of action. His fifth cause of action seeks an order for the return of the allegedly converted property.

2

promissory note; (6) the trial court's finding that Fletcher did not establish his claim of intentional interference with prospective economic advantage is also unsupported by substantial evidence; and (7) the Gubitosi defendants are responsible for payment on the promissory note under principles of ratification and unjust enrichment.[2] For reasons to be explained, we affirm the trial court's ruling in its entirety.

FACTS

Fletcher formed TTT in 2006. The company provided a private car service in the Tahoe-Truckee area, primarily transporting clients to and from the airport in Reno and the various ski resorts in the area. Beginning in 2010, Fletcher began entertaining other business ideas. As he put it during his testimony at trial, he "had been doing private car service for a long time" and "was ready to move on." One of several ideas was to start a private air charter service using a plane based in Truckee.

Fletcher began seeking buyers for TTT in 2011. His desired purchase price was $250,000. Ideally, Fletcher wanted an "all cash purchase" so that he could "exit the business and put cash in [his] pocket." Fletcher met Cheung through a mutual friend around March of that year. Cheung indicated she was interested in buying the business and informed Fletcher "she had the money to do so." However, she wanted to discuss the

---

[2] These are the issues raised and argued under separate headings in the discussion portion of Fletcher's opening brief. Additional issues are listed, but not argued, in a section titled "Principal Issues on Appeal." However, where an appellant fails to adequately present a point under a separate heading in its opening brief, the contention is forfeited. (Cal. Rules of Court, rule 8.204(a)(1)(B); *San Joaquin River Exchange Contractors Water Authority v. State Water Resources Control Bd.* (2010) 183 Cal.App.4th 1110, 1135 [argument forfeited for lack of separate heading]; *State ex rel. Dept. of Pesticide Regulation v. Pet Food Express* (2008) 165 Cal.App.4th 841, 855 [forfeiture due to failure to separately head argument and failure to support argument with legal and factual analysis].) Accordingly, we consider forfeited all issues raised in that section, but not presented under a separate heading and supported by adequate legal argument in the discussion portion of the opening brief.

3

matter with her friend and financial advisor, Gubitosi. Cheung told Fletcher "she had investments with him" and that they had "worked together . . . on Wall Street." Cheung also told Fletcher that her investments "would become liquid in January of 2013" and she would not be able to buy the business in its entirety until then.

Gubitosi and Cheung had worked together on Wall Street. Gubitosi was a senior trader who retired in 2000. Cheung was a sales assistant at the same brokerage firm. At Cheung's request, Gubitosi looked over TTT's financial documents and advised against purchasing the business. As he stated during his testimony at trial: "Told her there's no way she should do it, that I could not for the life of me, with all the documents, . . . put an evaluation on it. I didn't like the business model, and I didn't recommend she should go through with the purchase." Gubitosi also turned down her request for him to help her finance the purchase. Cheung's assertion that she had investments with Gubitosi was false. Gubitosi testified she had no such investments.

Notwithstanding Gubitosi's advice, Cheung and Fletcher came to terms on a purchase agreement. After some negotiating, they agreed on a $200,000 valuation for TTT. Cheung agreed to buy half of TTT's shares for $100,000. Initially, $50,000 was to be paid at signing as a down payment, with the remaining $50,000 to be paid in the form of a promissory note. Cheung would also receive an option to purchase the remaining shares at a later date.

In July 2011, the day before the purchase agreement was to be executed, Cheung informed Fletcher she was "not quite as liquid as she expected," and asked whether he would accept $30,000 at signing, with the remaining $20,000 of the down payment to be paid within "a week or two weeks." Fletcher agreed because he "didn't want to be the hard-nosed guy who made a deal breaker over that." Another reason Fletcher decided to go ahead with the deal despite the changed conditions was that he had committed to participate in an expedition of the south pole and would be unavailable to manage TTT

4

from late 2011 to early 2012. He reasoned that Cheung, who would then be half owner of the business, would be able to manage TTT during this time period.

The following day, Cheung informed Fletcher she had only $10,000 of the down payment. Fletcher decided to go ahead with the sale "for the same set of reasons." As he explained during his trial testimony, he "trusted her" and figured "it's hard to move that much money from New York to California." Accordingly, the terms of the purchase agreement signed by the parties provided for $10,000 of the down payment to be paid at signing with the remaining $40,000 to be paid within 14 days. The remainder of the purchase price was still to be paid in the form of a promissory note, payable at 9 percent interest over four years. Cheung's obligation under the note was secured by collateral in the form of a fraction of the financed shares, that fraction to be determined by dividing the amount of Cheung's outstanding debt by the total amount of the note. The purchase agreement, as well as a separate buy-sell agreement executed the same day between Fletcher and Cheung as equal shareholders of TTT stock, provided Cheung with an option to purchase TTT's remaining shares in February 2013 at a price to be determined by a formula set forth in the latter agreement.

The entirety of the down payment was not paid until January 30, 2012, more than six months after this amount was due under the agreement. Payments on the promissory note did not begin until February 2012, six months after payments were to begin under the note.

By June 2012, Cheung remained substantially behind in her payments under the promissory note. In the meantime, Fletcher became "more and more frustrated" and suggested to Cheung that one of the two should buy the other out of the business. Cheung floated the idea that perhaps Gubitosi would be interested in buying the business and suggested Fletcher speak to him about it. Fletcher and Gubitosi spoke by phone sometime that month.

5

According to Fletcher's account of the phone call, he explained that Cheung was behind in her payments to purchase half of TTT's shares and offered to sell Gubitosi the remaining shares if he also agreed to catch Cheung up on her payments under the note. Fletcher also asked Gubitosi about the investments Cheung said she had with him in New York. As Fletcher described Gubitosi's response: "He kind of laughed and said she doesn't have any investment in New York with me or with anyone else." Gubitosi also informed Fletcher that Cheung "had a negative net worth" and "was buried" in debt. On the subject of buying Fletcher's remaining shares and catching Cheung up on her payments, Gubitosi told Fletcher "that he retired from Wall Street" with a lot of money. Gubitosi told Fletcher that he would have to convince him the business was worth the price Fletcher wanted for his remaining shares. According to Fletcher, Gubitosi repeatedly began sentences with "I am not threatening you," causing Fletcher to believe a threat was intended, specifically a threat to use his financial resources as a "back-stop" for Cheung after she defaulted on her obligations rather than to help her follow through on purchasing TTT for the price Fletcher wanted. As Fletcher described this portion of the conversation: "He was trying to muscle me around with how much money he had and how little he thought the business was worth."

Gubitosi provided a more concise account of the call: "[Fletcher] seemed to be under the impression that I was going to give [Cheung] money to help her pay a debt. I told him I would not because I didn't approve of the purchase, and that was about it."

In October 2012, in a letter drafted by Fletcher's attorney, Fletcher declared Cheung to be in default of her obligations under the promissory note, declared the entire principal balance due and payable, along with unpaid interest and late-payment penalties, and offered to purchase Cheung's shares for $52,872.79, to be offset by the amount owed under the note. In response, Cheung's attorney drafted a letter offering Fletcher $50,000 for his shares conditioned on, among other things, Cheung's obligations under the note

6

being "deemed satisfied in full." Additional counteroffers were made and rejected. Ultimately, Fletcher and Cheung agreed to dissolve the company.

At some point prior to the decision to dissolve the company, Fletcher had another phone conversation with Gubitosi. According to Fletcher, Gubitosi told him that "he flew out from New York with a bag full of money" and was "prepared to spend $100,000 on litigation" to assist Cheung in her dispute with Fletcher. Gubitosi again said this was not a threat, but Fletcher took it to be one. As Fletcher described: "I felt like I was talking to a character in the Sopranos." Fletcher again offered to sell Gubitosi his remaining shares of TTT stock if Gubitosi also paid off what Cheung owed under the note, adding, "if you want to spend $100,000 fighting me, why don't you spend around the same numbers doing what [Cheung] said she would do?" Gubitosi again declined Fletcher's offer.

Gubitosi confirmed in his trial testimony that he told Fletcher he would help Cheung retain counsel. He added that Cheung had called him crying and claimed that Fletcher had "ambushed" her. Gubitosi felt that Fletcher was trying to intimidate his friend, so he called Fletcher to let him know Cheung was "very important" to him, and that Fletcher "should work things out" with Cheung because litigation is "very expensive, nobody wants to do it." Gubitosi denied making any threats during the phone call.

TTT was dissolved in November 2012. Fletcher received two vehicles from the company, both of which were encumbered by auto loans that were assumed by Fletcher. Cheung received one vehicle from the company that was also encumbered by an auto loan. Among the remaining assets, Fletcher received the company's domain name and Cheung received the phone number. In an e-mail from Fletcher's attorney to Cheung's attorney, the former agreed each was worth "a liquidation price of $500."

The same month, Fletcher formed a new private car service to operate in the Tahoe-Truckee area, Tahoe Sierra Transportation (Tahoe Sierra), and Gubitosi formed his own competing private car service, Tahoe Elite, making Cheung the company's

7

operations manager. Title to the vehicle Cheung received in the dissolution of TTT was transferred to Tahoe Elite and the phone number she received became the phone number for the new business. Tahoe Elite also took over various liabilities assumed by Cheung during the dissolution.

Also in November 2012, Cheung filed for bankruptcy in the United States Bankruptcy Court for the Eastern District of California. In August 2014, that court sustained Fletcher's objection to Cheung's attempt to discharge her obligation under the promissory note, concluding she transferred assets she received from the dissolution of TTT in order to fraudulently hinder Fletcher's ability to collect on the note. This decision was affirmed on appeal to the United States District Court. Cheung's subsequent appeal to the United States Court of Appeals for the Ninth Circuit was dismissed.

The lawsuit underlying this appeal followed. As previously stated, Fletcher sued Cheung and the Gubitosi defendants for: (1) fraud in the inducement of the agreement to sell half of TTT to Cheung, (2) money owed on the promissory note, (3) intentional interference with prospective economic advantage, (4) fraud in the inducement of the agreement to dissolve TTT, and (5) conversion of the assets Cheung received during the dissolution.

We set forth the trial court's decision following court trial in greater detail below. For present purposes, we note the trial court found Cheung fraudulently induced Fletcher to sell half of TTT's shares. However, aside from what Cheung owed on the promissory note, Fletcher did not prove damages attributable to Cheung's fraud. Fletcher was entitled to recover the total sum of $59,715.08 on the promissory note, plus reasonable attorneys' fees. His cause of action for intentional interference with prospective economic advantage failed because "Fletcher intended to disrupt his own relationship with TTT to seek other opportunities." Assuming Cheung fraudulently induced Fletcher to agree to dissolve TTT, Fletcher again did not prove damages beyond what Cheung owed on the note. Finally, Fletcher's cause of action seeking return of the property

8

received by Cheung in the dissolution failed because the division of TTT assets "equitably distributed value as between the two shareholders" and TTT, not Fletcher, would be the appropriate entity to assert such a claim. With respect to the Gubitosi defendants, the trial court ruled none of Cheung's false statements were legally attributable to Gubitosi. Indeed, there was "no evidence contradict[ing] the testimony of Gubitosi that he bluntly advised Cheung not to do the deal with Fletcher, and never promised Fletcher to make good [on] Cheung's promises of payment." The trial court also concluded Fletcher did not prove "Cheung and the Gubitosi defendants had some grand plan to usurp his position in the tourist transportation business in the Truckee-Tahoe market."

This appeal followed.

## DISCUSSION

## I

### *Alleged Conspiracy to Defraud Fletcher*

We address Fletcher's contentions regarding the alleged conspiracy between Cheung and the Gubitosi defendants together. Fletcher contends the trial court's finding that Cheung and Gubitosi did not enter into a conspiracy to defraud him is not supported by substantial evidence. He also claims the trial court applied an incorrect legal standard in determining no conspiracy existed and ignored undisputed evidence establishing the existence of a conspiracy as a matter of law. None of these contentions has merit.

We begin with the proper legal standard: "To prove a claim for civil conspiracy, [Fletcher] was required to provide substantial evidence of three elements: (1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) damages arising from the wrongful conduct. As is well established, civil conspiracy is not an independent tort. [Citation.] Rather, civil conspiracy is a 'legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its

9

perpetration. [Citation.]' [Citation.] As Witkin explains, 'If [the plaintiff] can show that each [of several defendants] committed a wrongful act or some part of it, e.g., that each made false representations, [the plaintiff] has no need of averments of conspiracy. But if A alone made representations, the plaintiff can hold B and C liable with A only by alleging and proving that A acted pursuant to an agreement (conspiracy) with B and C to defraud.' [Citation.]" (*Kidron v. Movie Acquisition Corp.* (1995) 40 Cal.App.4th 1571, 1581 (*Kidron*).)

" 'The sine qua non of a conspiratorial agreement is the knowledge on the part of the alleged conspirators of its unlawful objective and their intent to aid in achieving that objective.' [Citations.]" (*Kidron*, *supra*, 40 Cal.App.4th at p. 1582.) However, "[m]ere knowledge, acquiescence, or approval of an act, without cooperation or agreement to cooperate is insufficient to establish liability." (*Michael R. v. Jeffrey B.* (1984) 158 Cal.App.3d 1059, 1069.) " 'This rule derives from the principle that a person is generally under no duty to take affirmative action to aid or protect others.' [Citation.]" (*Kidron*, at p. 1582.) Moreover, "[w]hile knowledge and intent 'may be inferred from the nature of the acts done, the relation of the parties, the interest of the alleged conspirators, and other circumstances' [citation], ' "[c]onspiracies cannot be established by suspicions. There must be some evidence. Mere association does not make a conspiracy. There must be evidence of some participation or interest in the commission of the offense." ' [Citation.]" (*Ibid.*)

Contrary to Fletcher's argument in this appeal, the trial court's statement of decision does not indicate it applied an erroneous standard in assessing whether Gubitosi conspired with Cheung to fraudulently induce Fletcher to sell her half of TTT and then dissolve the company following Cheung's inability to pay off the promissory note. After concluding that "Cheung fraudulently induced Fletcher into the purchase agreement," the trial court found with respect to the Gubitosi defendants that "no evidence was presented that [Gubitosi] knew about or participated in any of the false representations made by

10

Cheung prior to the closing of the purchase and sale agreement. Therefore, none of that fraud is legally attributable to him, Tahoe Elite, or Marie Holdings." These statements make clear that the trial court understood that in order to find the Gubitosi defendants liable as coconspirators, Fletcher had to prove Gubitosi had both knowledge of Cheung's fraudulent scheme and the intent to aid in achieving Cheung's objective.

Fletcher takes issue with the trial court's statement that he presented " 'no evidence' " that "Gubitosi knew of Cheung's fraudulent misrepresentations or the fact that she intended to make them to Fletcher" prior to execution of the purchase agreement, arguing it can be inferred from Gubitosi's role as Cheung's financial advisor and their close personal relationship that he knew she had no ability to purchase half of TTT's shares without committing fraud. While Gubitosi undoubtedly knew Cheung was in no position financially to purchase half of TTT, this does not mean he also likely knew she intended to misrepresent her financial situation in order to induce Fletcher to sell. The trial court found, based on Gubitosi's testimony, that he had no such knowledge. Substantial evidence supports this finding. " 'Where findings of fact are challenged on a civil appeal, we are bound by the "elementary, but often overlooked principle of law, that . . . the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," to support the findings below. [Citation.] We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor in accordance with the standard of review . . . .' [Citation.]" (*SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 462.) "The testimony of one witness, even that of a party, may constitute substantial evidence." (*In re Marriage of Fregoso & Hernandez* (2016) 5 Cal.App.5th 698, 703.)

However, even if Gubitosi knew about Cheung's intent to defraud Fletcher, as we have previously explained, "[m]ere knowledge, acquiescence, or approval of an act, without cooperation or agreement to cooperate is insufficient to establish liability" for

11

conspiracy.  (*Michael R. v. Jeffrey B.*, *supra*, 158 Cal.App.3d at p. 1069.)  Bearing on the requirement of cooperation or agreement to cooperate, the trial court found Fletcher presented "[n]o evidence" that Cheung and Gubitosi joined together to negotiate the purchase agreement "as a ruse to beat Fletcher out of his relationship with TTT," as Fletcher argued at trial.  Fletcher takes issue with this finding as well, arguing:  "There is no logical reason for Cheung's fraud other than she hoped she would be able to gain an advantage which would enable her to gain control of TTT or at least some of its assets (as she and Gubitosi did) through the disruption her inability to pay would cause Fletcher and the operations of TTT."  Not so.  A perfectly logical reason for Cheung to misrepresent her financial ability to purchase TTT in order to induce Fletcher to sell her half of the company is that she believed she would be able to make enough money as half owner of TTT to be able to pay the remainder of the down payment, catch up on her payments under the promissory note, and ultimately buy Fletcher's remaining shares.  The fact that such optimism was unwarranted, and her inability to comply with the terms of the agreement to Fletcher's satisfaction was entirely foreseeable, does not necessarily mean there was a more nefarious motive behind Cheung's misrepresentation of her financial ability or that Gubitosi conspired with her to gain TTT assets for less than fair value.

Moreover, in addition to finding Gubitosi lacked the requisite knowledge of Cheung's fraudulent intent, the trial court also found "no evidence contradicts the testimony of Gubitosi that he bluntly advised Cheung not to do the deal with Fletcher."  This finding alone precludes the trial court from finding the requisite intent to aid Cheung's fraudulent inducement of the purchase agreement.  Stated simply, a conspirator who wants to aid in the fraudulent inducement of a purchase agreement does not advise the person with whom he is conspiring not to enter into the agreement.  We also conclude this finding is supported by substantial evidence.  (*In re Marriage of Fregoso & Hernandez*, *supra*, 5 Cal.App.5th at p. 703.)

12

Fletcher additionally takes issue with certain statements the trial court made on the record while addressing his argument that the bankruptcy court's findings precluded the trial court from concluding in this case that Cheung and Gubitosi did not fraudulently conspire to transfer TTT assets to Tahoe Elite following the dissolution. The trial court stated that it did not interpret the bankruptcy judge's ruling to "impute to Mr. Gubitosi the fraudulent intent that he imputed to Ms. Cheung on those transfers." The trial court continued: "I think conspiracy is not a word I remember [the bankruptcy judge] using, but I think it's more that he had evidence that Mr. Gubitosi somehow financially participated in the transactions. Does that make him a conspirator? I don't think so. Unless I've got evidence that he and Ms. Cheung sat down and said, look, let's beat TTT and Mr. Fletcher out of these assets by doing this. [¶] . . . [¶] . . . and I [(Cheung)] can only do that if I have your [(Gubitosi's)] money. I didn't hear anything, and nothing that I hear in [the bankruptcy judge's] findings [is] anywhere near that."

Fletcher argues these statements reveal the trial court was requiring "proof of a discussion and agreement" between Cheung and Gubitosi in order to find a conspiracy between the two, "directly contradict[ing] case law." While we certainly agree that express agreement to defraud is not required (see *Wyatt v. Union Mortgage Co.* (1979) 24 Cal.3d 773, 785 [either tacit consent or express approval sufficient to hold a person liable as a coconspirator]), these statements by the trial court were made in response to an argument regarding the preclusive effect of the bankruptcy judge's findings. They do not amount to a *ruling* as to what would be required to prove the alleged conspiracy in this case.

In any event, as we have explained, the trial court's ruling, supported by substantial evidence, that Gubitosi advised Cheung not to enter into the purchase agreement precludes a finding that he conspired to aid her in the fraudulent inducement of that agreement as alleged in the first cause of action. With respect to Fletcher's cause of action for fraud in the inducement of the dissolution agreement, the trial court noted

13

this claim was based on Cheung's failure to disclose her intention to file for bankruptcy in order to get out of paying what she owed on the promissory note. The trial court assumed Cheung had a duty to inform Fletcher of this intention and, by failing to do so, fraudulently induced the dissolution. However, the trial court found "no evidence that Gubitosi even knew of Cheung's intention to seek Chapter 7 relief. Gubitosi specifically denied any involvement in Cheung's bankruptcy filing, and no evidence was produced to contradict that unequivocal denial." Thus, the trial court found Gubitosi lacked the requisite knowledge of Cheung's fraudulent plan to induce the dissolution of TTT in order to obtain half of the company's assets and then discharge her debt under the promissory note in bankruptcy. This finding is supported by substantial evidence and precludes the Gubitosi defendants' liability for conspiracy to defraud as alleged in the fourth cause of action.

Nevertheless, Fletcher relies on *de Vries v. Brumback* (1960) 53 Cal.2d 643 (*de Vries*) for the proposition that a conspirator need not join the conspiracy at its inception in order to be liable "for the prior acts of his fellow conspirators in furtherance of the common design." (*Id*. at p. 649.) Such reliance is misplaced. That case involved a jewelry heist. The plaintiff, assignee of the jewelry firm that was robbed, recovered a sum of money from the defendant, who purchased and took possession of " 'the greater part of said stolen property' " during a meeting with both the robber and another man acting as middleman. (*Id*. at p. 646, italics omitted.) Before taking possession, the defendant was made aware of the robbery and conspiracy to convert all of the stolen property into cash. The trial court found that by taking possession of the majority of the stolen property with such knowledge, the defendant "joined, ratified and participated in said conspiracy," and was therefore liable for conversion, not only of the property he took into his possession, but all of the property stolen in the heist. (*Ibid*.)

Our Supreme Court affirmed. Noting the defendant's appeal was from the judgment roll, the court first explained that the sufficiency of the evidence supporting the

14

trial court's findings was not open in such an appeal. (*de Vries*, *supra*, 53 Cal.2d at pp. 647-648.) The court then stated: "It is the settled rule that 'to render a person civilly liable for injuries resulting from a conspiracy of which he was a member, it is not necessary that he should have joined the conspiracy at the time of its inception; every one who enters into such a common design is in law a party to every act previously or subsequently done by any of the others in pursuance of it.' [Citations.] Having been found to have joined and actively participated in the continuing conspiracy to convert, appellant became liable for the previous acts of his coconspirators under the rules relating to civil liability, and the fact that some of the missing goods may never have come into his possession would not absolve him from liability." (*Id.* at p. 648.)

Fletcher argues that even if Gubitosi did not join in Cheung's conspiracy from the outset, he "joined with Cheung to finance a razing [*sic*] of her fraud from the ashes by providing cash to utilize the fruits of her fraudulent efforts." This appears to mean that Gubitosi joined the conspiracy when he created Tahoe Elite, funded the new company with loans from Marie Holdings, and accepted the transfer of assets Cheung received from the dissolution of TTT. Thus, according to Fletcher, "[u]nder the rule of *de Vries*, Gubitosi is a conspirator and liable for all damages caused by all wrongs committed in the pursuit of Cheung's objective because he enabled her to realize her objective and the fruits of her fraud."

We are not persuaded. What is missing in this case is a finding that Gubitosi created and funded Tahoe Elite and took possession of the assets Cheung received from TTT with knowledge that Cheung fraudulently induced Fletcher to dissolve the company so that she could receive those assets while intending to declare bankruptcy to prevent Fletcher from recovering on the promissory note. In *de Vries*, what made the defendant a conspirator in the plan to convert all of the stolen property was not simply that he took possession of the bulk of that property; it was that he did so with knowledge of the unlawful plan and thereby "joined, ratified and participated in said conspiracy." (*de*

15

*Vries*, *supra*, 53 Cal.2d at p. 646, italics omitted.) Here, the trial court specifically found Gubitosi had no such knowledge.

In sum, the trial court's ruling that Cheung and Gubitosi did not enter into a conspiracy to defraud Fletcher is supported by substantial evidence. Nor has Fletcher persuaded this court that the trial court applied an incorrect legal standard in reaching this conclusion or that the trial court ignored undisputed evidence establishing the existence of a conspiracy in this case.

## II

### *Alternative Theories of Liability for Fraud*

Fletcher asserts the Gubitosi defendants are also liable under other legal theories, Gubitosi as an aider and abettor, and his businesses under the doctrine of respondeat superior. He is mistaken.

Beginning with Gubitosi, Fletcher relies on the " 'concert of action' " doctrine described by our Supreme Court in *Sindell v. Abbott Laboratories* (1980) 26 Cal.3d 588: "The elements of this doctrine are prescribed in section 876 of the Restatement Second of Torts. The section provides, 'For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.' With respect to this doctrine, Prosser states that 'those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or ratify and adopt his acts done for their benefit, are equally liable with him. [¶] Express agreement is not necessary, and all that is required is that there be a tacit understanding . . . .' [Citation.]" (*Id*. at p. 604.)

16

Fletcher argues "Gubitosi ratified Cheung's fraudulent acts for his benefit by accepting and using the TTT assets which she received in the aborted dissolution and transferred in violation of bankruptcy law." This argument fails for the same reason his conspiracy argument failed. The trial court found Gubitosi did not know Cheung intended to fraudulently induce the dissolution of TTT in order to obtain half of the company's assets by failing to disclose her intent to attempt to discharge her debt under the promissory note in bankruptcy. Nor is there any substantial evidence in the record that Cheung did so on Gubitosi's behalf or for his benefit. Thus, his receipt of the assets Cheung received in the dissolution cannot be considered a ratification of Cheung's fraud or subject him to liability for acting in concert with her.

Turning to Tahoe Elite and Marie Holdings, Fletcher argues these entities are liable under the doctrine of respondeat superior because Gubitosi acted on their behalf when he arranged for the transfer of the assets Cheung received in the dissolution and caused Tahoe Elite to employ Cheung, "who gained her knowledge of the transportation business by virtue of her fraud." In making this argument, Fletcher relies on *Persson v. Smart Inventions, Inc.* (2005) 125 Cal.App.4th 1141 (*Persson*), a case in which the jury found a 50 percent shareholder of an invention company (Nokes) fraudulently concealed from the other 50 percent shareholder (Persson) a promising invention in order to induce a buyout of Persson's interest in the company. Although the jury also found the company itself did not conceal material facts, the trial court entered judgment notwithstanding the verdict against the company, "concluding that the evidence fully supported the conclusion that Nokes was acting on behalf of [the company] at all times, and there was no substantial evidence to the contrary." (*Id.* at p. 1167, fn. omitted.)

Here, although Gubitosi was acting on behalf of Tahoe Elite when he received the dissolution assets and hired Cheung to manage the new company, and was acting on behalf of Marie Holdings when he issued loans to Tahoe Elite to finance the company, in order for respondeat superior liability to attach to either company, Gubitosi would have to

17

have committed a tort while acting within the scope of such agency or employment. (See *Von Beltz v. Stuntman, Inc.* (1989) 207 Cal.App.3d 1467, 1488 ["a private corporation is generally liable under the doctrine of respondeat superior for torts of its agents or employees committed while they are acting within the scope of their employment"].) We have already concluded Gubitosi is not liable for Cheung's fraud either as a conspirator or as an aider and abettor. His companies cannot be held vicariously liable for fraud on this record.

## III

### *Damages for Fraud*

Fletcher also claims the trial court erred in concluding he did not carry his burden of proving damages for fraud beyond the balance due on the promissory note. We disagree.

"It is settled law that if a defrauded party is induced by false representations to execute a contract, the party has the option of rescinding the contract or affirming it and recovering damages for the fraud" under Civil Code section 3343.[3] (*Persson*, *supra*, 125 Cal.App.4th at p. 1153.) Fletcher chose to affirm the contract, recover the amount Cheung still owed under the promissory note, and seek to recover additional damages for fraud.

"California law generally limits a defrauded party to recovering out-of-pocket damages, as stated in . . . section 3343. [Citation.] The out-of-pocket rule ' "is directed to restoring the plaintiff to the financial position enjoyed by him [or her] prior to the fraudulent transaction, and thus awards the difference in actual value at the time of the transaction between what the plaintiff gave and what he [or she] received." ' [Citation.]" (*OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.* (2007) 157

---

[3]     Undesignated statutory references are to the Civil Code.

18

Cal.App.4th 835, 870 (*OCM Principal*); § 3343, subd. (a) [a person who is "defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he [or she] received"].)

Prior to a 1971 amendment to section 3343, "a defrauded party could not receive anticipated profits in an action for damages" under this provision. (*Croeni v. Goldstein* (1994) 21 Cal.App.4th 754, 759 (*Croeni*).) The amendment "permitted lost profits as an element of damages in appropriate cases to correct 'certain logical inconsistencies [that] existed between the judicial application of [former section 3343] and that of other enactments dealing with the measure of damages for fraud.' [Citation.] For example, in fraud cases *not* involving the purchase, sale or exchange of property, lost profits were available under the general tort recovery statute, section 3333, or under section 3300 in breach of contract cases, and full 'benefit-of-the-bargain' damages were recoverable under California Uniform Commercial Code section 2721." (*Ibid*.)

Thus, in addition to out-of-pocket damages, section 3343 now provides: "Where the defrauded party has been induced by reason of the fraud to sell or otherwise part with the property in question, an amount which will compensate him [or her] for profits or other gains which might reasonably have been earned by use of the property had he [or she] retained it." (§ 3343, subd. (a)(3).) "However, the 1971 amendment did not repeal, amend or affect the doctrine of election of remedies, nor did it provide for a double recovery by defrauded parties." (*Croeni*, *supra*, 21 Cal.App.4th at p. 759.)

In *Croeni*, relied upon by Fletcher in this case, the plaintiffs (Croeni) sold their label printing business to two of the defendants in the underlying action, a corporation (Alford) and its parent company (Kane), in reliance on certain fraudulent representations made by the third defendant (Goldstein), who was an officer of Alford and represented the company during the sale negotiations. Croeni sued Alford and Kane for breach of contract and also sued all defendants for fraudulent inducement of the sale agreement.

19

(*Croeni*, *supra*, 21 Cal.App.4th at pp. 756-757.) The Court of Appeal explained that notwithstanding section 3343, subdivision (a)(3), "since [Croeni] sought to enforce the sale and obtain the sale price to which they agreed, they cannot recover from Alford and Kane profits they would have earned had they kept the business, since this would amount to a double recovery. In other words, the amount of profit earned by the business is one of the factors taken into account in establishing its value, and reflected in the sale price. If [Croeni] were seeking rescission against Alford and Kane, lost profits would be recoverable from them." (*Croeni,* at pp. 759-760.) However, the court also held Croeni was entitled to recover lost profits under section 3343, subdivision (a)(3) from Goldstein because that defendant "was not a party to the agreement [and] could not be sued for its breach or for rescission, but remains liable under any other 'legal or equitable remedies to which [Croeni] may be entitled.' " (*Croeni,* at p. 760, quoting § 3343, subd. (b)(2).)

Here, the same party, Cheung, made the fraudulent representations and entered into the purchase agreement. Thus, Fletcher would not be entitled to lost profits under the theory available to Croeni with respect to Goldstein. Fletcher also tacitly concedes in his briefing that had he sold the entirety of TTT to Cheung, his decision to enforce the sale and recover the sale price would preclude him from recovering profits he would have received from TTT had he not sold the business. He argues that because he sold only half of TTT to Cheung, he was still entitled to profit from his remaining shares and is therefore entitled to recover both the sale price of the shares he sold (measured by the amount Cheung still owed on the promissory note) and the diminution in value of the shares he retained (measured by the difference between the $100,000 Fletcher and Cheung agreed half of TTT's shares was worth at the time of the purchase and the last offer Cheung made for Fletcher's remaining shares in November 2012). According to Fletcher's calculation, this diminution in value amounted to "nearly $95,000." We are not persuaded.

20

Returning to section 3343, subdivision (a)(3), that provision allows "the defrauded party [who] has been induced by reason of the fraud to sell or otherwise part with the property in question" to recover "an amount which will compensate him [or her] for profits or other gains which might reasonably have been earned by use of the property had he [or she] retained it." (§ 3343, subd. (a)(3).) Fletcher's argument assumes that had he not been fraudulently induced to sell half of TTT's shares to Cheung, his continued ownership of all of TTT would have kept the value of the company at the $200,000 level he and Cheung agreed the company was worth at the time of the purchase agreement. We agree with the trial court's determination that this is "to be blunt, rank speculation." Fletcher, of course, blames Cheung entirely for the failure of TTT after she became part owner. However, as the trial court correctly observed, "Fletcher fails to acknowledge the impact of his choice at the beginning of this saga to distance himself from the transportation business for other opportunities." That was the reason he decided to go through with the purchase agreement despite multiple warning signs that Cheung did not have the financial wherewithal to make good on the purchase of half of TTT, let alone exercise her option to purchase the remainder of the company in February 2013. Fletcher may well have been able to manage TTT better than Cheung even taking into account his expedition to the south pole. But maybe not. We certainly cannot fault the trial court for being unconvinced.

The trial court also pointed out that Fletcher provided "no evidence about the overall market conditions, the amount of competition from other vendors other than Tahoe Elite, and fail[ed] to acknowledge the suspension of TTT for its failure to pay its tax obligations to the Franchise [T]ax [B]oard." In response, as mentioned, Fletcher argues the market value of his remaining shares at the time of the fraud was $100,000. This valuation is based on the purchase agreement. He then argues Cheung's offer in November 2012 of $50,000 minus $5,211 in TTT tax liabilities ($44,789), conditioned on deeming her remaining debt on the promissory note ($39,247.72) paid in full, sufficed to

21

establish the market value of his remaining shares as of that date ($5,541.28), amounting to "a diminution of nearly $95,000 in value from the $100,000 value for each half [of TTT] established by the purchase agreement." An alternative calculation of diminution in value proposed by Fletcher, using the same method but taking into account certain "alleged obligations of Fletcher," resulted in "a decline in value of more than . . . $75,000." The trial court was not required to accept these proposed methods for calculating diminution in value of Fletcher's remaining shares.

More importantly, even assuming TTT was actually worth the $200,000 that Fletcher and Cheung agreed to at the time she purchased half of the company's shares–although Gubitosi certainly believed it was not worth that amount–and further assuming the value of the company had dramatically declined by the time Fletcher and Cheung were offering to buy each other out of the business, what was missing was evidence sufficient to persuade the trial court that this decline in value was caused by Cheung's fraud and not other market conditions. "Generally, to recover for fraud, the plaintiff must prove ' " 'detriment proximately caused' by the defendant's tortious conduct. [Citation.] Deception without resulting loss is not actionable fraud. [Citation.] 'Whatever form it takes, the injury or damage must not only be distinctly alleged but its causal connection with the reliance on the representations must be shown.' " [Citations.]' [Citation.]" (*OCM Principal*, *supra*, 157 Cal.App.4th at p. 870.) None of the evidence cited by Fletcher in his appellate briefing established such causation to the trial court's satisfaction. Nor do we accept Fletcher's suggestion that because the trial court did not address each item of evidence in its statement of decision that it "failed to consider Fletcher's evidence in support of his damage claims."

Finally, we note that Fletcher also relies on section 3343, subdivision (a)(2), making recoverable as damages for fraud in the inducement of the sale of property: "An amount which would compensate the defrauded party for loss of use and enjoyment of the property to the extent that any such loss was proximately caused by the fraud." He

22

does not separately analyze this subdivision, however, and has therefore forfeited any argument that the damages he asserts fall within its scope. (See *300 DeHaro Street Investors v. Department of Housing & Community Development* (2008) 161 Cal.App.4th 1240, 1257.) In any event, as with subdivision (a)(3), causation is required and lacking in this case.

We cannot conclude the trial court erred in finding Fletcher did not carry his burden of proving damages for fraud beyond the balance due on the promissory note.

## IV

### *Alleged Intentional Interference with Prospective Economic Advantage*

Fletcher additionally contends the trial court's finding that he did not establish his claim of intentional interference with prospective economic advantage is unsupported by substantial evidence. Not so.

"In order to prove a claim for intentional interference with prospective economic advantage, a plaintiff has the burden of proving five elements: (1) an economic relationship between the plaintiff and a third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) an intentional act by the defendant, designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the defendant's wrongful act, including an intentional act by the defendant that is designed to disrupt the relationship between the plaintiff and a third party. [Citation.] The plaintiff must also prove that the interference was wrongful, independent of its interfering character. [Citation.] '[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard.' [Citation.]" (*Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937, 944.)

The trial court found Fletcher did not establish the third element of this tort. We recite the trial court's reasoning in its entirety:

23

"Fletcher's claim founders on the third element of intentional acts designed to disrupt [his relationship with TTT].

"Instead, the evidence demonstrates that Fletcher intended to disrupt his own relationship with TTT to seek other opportunities: specifically the Antarctic expedition and related media activities. No evidence supports the suggestion that Cheung and the Gubitosi defendants negotiated the Purchase Agreement as a ruse to beat Fletcher out of his relationship with TTT. Indeed, the Purchase Agreement itself belies that suggestion.

"The Purchase Agreement entitled, but did not require, Cheung to buy out the second half of the shares of TTT at either an agreed price, or a price determined by a procedure set forth therein. The non-compete provision imposed on Fletcher only kicked in after those remaining shares had been purchased. Until such a buy-out, Fletcher remained free to profit from his relationship with TTT and its customers.

"Moreover, the Purchase Agreement protected Fletcher from Cheung's defaults by entitling him to exercise on the shares Cheung had purchased as security for the Note. No conspirator in his or her right mind would have vested that power in the target of a conspiracy to usurp the relationship.

"Specifically as to the Gubitosi defendants, no evidence contradicts the testimony of Gubitosi that he bluntly advised Cheung not to do the deal with Fletcher, and never promised Fletcher to make good to Fletcher [on] Cheung's promises of payment. If the plan had been to use the Purchase Agreement as a ruse to wrest away control of TTT, one would expect Gubitosi to protect the plan by making sure that events of default did not empower Fletcher to exercise his rights as a secured creditor.

"Fletcher has failed to demonstrate that it is more likely than not that Cheung and the Gubitosi defendants had some grand plan to usurp his position in the tourist transportation business in the Truckee-Tahoe market.

"When things fell apart because of the defaults of Cheung and the breakdown of the rather naïve relationship between Fletcher and Cheung at the commencement of the

24

transaction, nothing in the election to liquidate and the distribution of assets as between Fletcher and Cheung demonstrates anything other than two shareholders of a failed 'partnership' picking the bones of the failed enterprise in an equitable fashion. Fletcher had powerful contractual remedies that he elected not to exercise out of what he described as his fear of being out-lawyered by Gubitosi.

"No evidence suggests to this court that the communications between Fletcher and Gubitosi that led Fletcher to that conclusion were anything other than frank business-driven arms-length communications by a savvy businessman to one not quite as savvy. The contractual remedies available to Fletcher empowered him to protect his relationship with TTT, and for reasons known only to him, he elected not to exercise those rights. He cannot off-load the consequences of that choice onto Cheung or the Gubitosi defendants on this record. Fletcher's claim for intentional interference, therefore fails." (Fn. omitted.)

Aside from complaining that the trial court's reasoning "makes no sense" and is filled with "non sequiturs," Fletcher does not provide us with much analysis regarding the third element of this cause of action. We decline to engage with him point-by-point regarding specific portions of the trial court's ruling. "An opinion is not . . . a brief in reply to the counsel against whose views we decide. It is merely a statement of conclusions, and of the principal reasons which have led us to them." (*Holmes v. Rogers* (1859) 13 Cal. 191, 202.) What we must determine is whether the evidence adequately supports the trial court's finding that Fletcher failed to establish an intentional act by either Cheung or the Gubitosi defendants that was designed to disrupt Fletcher's relationship with TTT. We conclude it does.

Returning to the all-important standard of review, " 'we are bound by the "elementary, but often overlooked principle of law, that . . . the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," to support the findings below. [Citation.] We

25

must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor in accordance with the standard of review . . . .'  [Citation.]" (*SFPP v. Burlington Northern & Santa Fe Ry. Co.*, *supra*, 121 Cal.App.4th at p. 462.)

Here, with respect to the Gubitosi defendants, the trial court found no wrongful conduct at all, let alone conduct designed to disrupt Fletcher's relationship with TTT. For reasons expressed in our rejection of Fletcher's conspiracy arguments, we also conclude substantial evidence supports this finding.

With respect to Cheung, she certainly engaged in wrongful conduct when she misrepresented her financial status in order to induce Fletcher to sell her half of TTT's shares.  However, substantial evidence supports the conclusion this was not done with the intent to disrupt Fletcher's relationship with TTT.  Instead, Fletcher candidly admitted he wanted out of the transportation business and naïvely took Cheung at her word that she would be able to fulfill her obligations under the purchase agreement and then exercise her option to buy him out entirely.  That is what Fletcher wanted.  Viewing the evidence favorably to Cheung on this issue, as we must, she apparently, and also naïvely, believed she would be able to make up her initial shortfall on the down payment, catch up on her payments under the promissory note, and either buy Fletcher out herself or with the help of Gubitosi.  When Fletcher eventually declared her to be in default of her obligations under the note and declared the entire principal balance due and payable, he could have foreclosed on the shares constituting the collateral under the agreement.  Fletcher acknowledges this would have been about 4,000 of the 10,000 shares he sold to her.  Had Fletcher done so, he would have controlled 14,000 of the company's total shares to Cheung's 6,000.  Fletcher asserts this would have been a "useless[]" remedy because Cheung would have been able to repurchase these 4,000 shares, along with Fletcher's remaining 10,000 shares, at a discount in February 2013, but he does not explain how Cheung would have been able to enforce her buyout option when she was in breach of the

26

agreement.  Moreover, Fletcher also could have elected to rescind the purchase agreement due to Cheung's fraud, returned what she paid him, and recovered all shares of the company.  (See § 1692.)  We need not take up these issues in any detail here.  The point the trial court was making when citing Fletcher's "powerful contractual remedies" was that they belied any notion that Cheung's fraud was designed to disrupt Fletcher's relationship with TTT.  We agree with this assessment.

Substantial evidence supports a conclusion that Cheung's fraud was designed to buy her way into TTT with the hope of eventually buying Fletcher out of the business.  It was not designed to "disrupt" his relationship with the company, at least not until she successfully bought him out, at which point the buyout would not be a disruption since that is precisely what Fletcher wanted from the start.

## V

### *Alleged Ratification of the Promissory Note and Unjust Enrichment*

Finally, Fletcher asserts the Gubitosi defendants are responsible for payment on the promissory note under principles of ratification and unjust enrichment.  These assertions are based on Gubitosi's receipt on behalf of Tahoe Elite of the assets Cheung received during the dissolution of TTT.  Fletcher argues receipt of the assets amounted to ratification of Cheung's obligation to pay the promissory note and, in the alternative, unjustly enriched the Gubitosi defendants entitling Fletcher to restitution.  We are not persuaded.

Fletcher's ratification argument is based on principles of agency.  We have already concluded substantial evidence supports the trial court's finding that Gubitosi did not know Cheung intended to fraudulently induce either the purchase agreement or the dissolution of TTT in order to obtain half of the company's assets by failing to disclose her intent to attempt to discharge her debt under the promissory note in bankruptcy.  Nor is there any substantial evidence in the record that Cheung engaged in either fraud on Gubitosi's behalf or for his benefit.  In addition to foreclosing liability on the part of the

27

Gubitosi defendants for fraud, we also conclude the lack of an agency relationship precludes a finding that these defendants, by receiving the assets, ratified Cheung's agreement to pay the promissory note. Fletcher cites us to no legal authority that would compel a contrary result.

With respect to Fletcher's unjust enrichment argument, we simply note that he has not persuaded this court that he is equitably entitled to restitution from the Gubitosi defendants because of their receipt of assets that belonged, not to him, but to TTT prior to the dissolution of the company. Nor does Fletcher cite us to any legal authority establishing such restitution would encompass paying Cheung's obligation on the promissory note.

## DISPOSITION

The judgment is affirmed. Respondents shall recover costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

_/s/_____
HOCH, J.

We concur:

_/s/_____
BLEASE, Acting P. J.

_/s/_____
DUARTE, J.